WILLIAM M. WELCH, II
Chief, Public Integrity Section

NICHOLAS A. MARSH
EDWARD P. SULLIVAN
Trial Attorneys
Public Integrity Section
United States Department of Justice
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20005
(202) 514-1412

JOSEPH W. BOTTINI
JAMES A. GOEKE
Assistant U.S. Attorneys
District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska 99513-7567
(907) 271-5071

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No: |
| | ) |
| | ) COUNT 1: |
| Plaintiff, | ) CONSPIRACY TO COMMIT EXTORTION |
| | ) UNDER COLOR OF OFFICIAL RIGHT, |
| vs. | ) BRIBERY, AND HONEST SERVICES |
| | ) MAIL AND WIRE FRAUD |
| PETER KOTT, | ) Vio. 18 U.S.C. § 371 |
| Defendant, | ) |
| | ) COUNT 2: |
| and | ) INTERFERENCE WITH COMMERCE BY |
| | ) EXTORTION INDUCED UNDER COLOR |
| BRUCE WEYHRAUCH, | ) OF OFFICIAL RIGHT **(KOTT)** |
| | ) Vio. 18 U.S.C. § 1951(a) and § 2 |
| Defendant. | ) |
| | ) COUNT 3: |
| | ) ATTEMPTED INTERFERENCE WITH |
| | ) COMMERCE BY EXTORTION INDUCED |
| | ) UNDER COLOR OF OFFICIAL RIGHT |
| | ) **(WEYHRAUCH)** |
| | ) Vio. 18 U.S.C. § 1951(a) and § 2 |
| | ) |
| | ) COUNT 4: |
| | ) BRIBERY CONCERNING PROGRAMS |
| | ) RECEIVING FEDERAL FUNDS **(KOTT)** |
| | ) Vio. 18 U.S.C. § 666(a)(1)(B) and § 2 |

)  COUNT 5:
)  BRIBERY CONCERNING PROGRAMS
)  RECEIVING FEDERAL FUNDS
)  **(WEYHRAUCH)**
)    Vio. 18 U.S.C. § 666(a)(1)(B) and § 2
)
)  COUNT 6:
)  HONEST SERVICES WIRE FRAUD
)  **(KOTT)**
)    Vio. 18 U.S.C. §§ 1343, 1346 and § 2
)
)  COUNT 7:
)  HONEST SERVICES MAIL FRAUD
)  **(WEYHRAUCH)**
)    Vio. 18 U.S.C. § 1341, 1346 and § 2

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

## CONSPIRACY TO COMMIT EXTORTION UNDER COLOR OF OFFICIAL RIGHT, BRIBERY, AND HONEST SERVICES MAIL AND WIRE FRAUD (18 U.S.C. § 371)

### General Allegations

At all times material to this Indictment:

1.     PETER KOTT (hereinafter "KOTT") was an elected member of the Alaska

House of Representatives.  KOTT represented District 17, located in Eagle River, Alaska.

KOTT was first elected to the Alaska House of Representatives in 1992.  KOTT served in

the House of Representatives until January 2007. From January 1, 2003 to December 31, 2004, KOTT served as the Speaker of the House.

2.      Kott's Hardwood Flooring was an Alaska-based business in which KOTT was a part-owner and operator.

3.      BRUCE WEYHRAUCH (hereinafter "WEYHRAUCH") was an elected member of the Alaska House of Representatives. WEYHRAUCH represented District 4, located in Juneau, Alaska. WEYHRAUCH was first elected to the Alaska House of Representatives in 2002. WEYHRAUCH served in the House of Representatives until January 2007. WEYHRAUCH is an attorney licensed to practice in the State of Alaska.

4.      A company known to the grand jury but unnamed (hereinafter referred to as "COMPANY A") was a privately held company that was incorporated in a State other than the State of Alaska. COMPANY A was a multinational corporation that provided services to the energy, resource, and process industries and to the public sector. COMPANY A was comprised of multiple subsidiary companies and, collectively, COMPANY A was engaged in interstate commerce in connection with the foregoing projects, including the construction of a prison located in Barbados.

5.      At various times, the Alaska State Legislature had issues and matters under consideration that had a business impact on COMPANY A. Therefore, COMPANY A and its principals took an active interest in the Alaska State Legislature's consideration of those issues and matters.

-3-

6.     COMPANY CEO was the Chief Executive Officer and part-owner of
Company A. COMPANY CEO was a resident of Alaska.

7.     COMPANY VP was the Vice President for Government Relations of
Company A. COMPANY VP was a resident of Alaska.

8.     State Senator A was an elected member of the Alaska State Senate. State
Senator A's term as a member of the Alaska State Senate ended in January, 2007.

9.     Polling Company was a business with offices in Anchorage, Alaska, that
provides polling services for political campaigns.

10.     Suite 604 was a hotel suite in Juneau, Alaska, rented by COMPANY A and
used by COMPANY CEO, COMPANY VP, and others.

## ALASKA'S INTRA-STATE NATURAL GAS PIPELINE PROPOSAL

11.     Beginning in or around 2005, the State of Alaska was involved in
negotiations with representatives of three oil companies (collectively, the "oil producers")
concerning the construction of a natural gas pipeline from Alaska's North Slope. The
agreement to build the proposed gas pipeline must ultimately be approved by the Alaska
State Legislature.

12.     The construction of the gas pipeline was important to COMPANY A.
COMPANY A was primarily an oil field services company, and a significant source of
COMPANY A's income was derived from contracts with the oil producers in Alaska.

-4-

13.     On or about February 21, 2006, the Governor of the State of Alaska (hereinafter "Governor") announced that the state had reached an agreement with the primary oil producers regarding the construction of a gas pipeline. The terms of the agreement concerning construction of the pipeline were not announced or released at that time. Instead, the Governor announced that the agreement with the oil producers included a provision that addressed a significant change to the manner in which the State of Alaska taxes oil production. If the Alaska State Legislature did not approve the proposed change in the manner in which oil production was taxed by the state, then the agreement concerning construction of the gas pipeline would not take effect.

14.     Shortly after that announcement, the Governor's administration proposed legislation relating to the negotiated change in the taxation of oil production. The newly proposed tax system – referred to as a "petroleum production tax" or "PPT" – would be based upon a percentage of the producer's net profits, or revenues minus capital and operating expenditures. Under the proposed system agreed to by the state, the producers would pay a 20 percent tax rate and receive a 20 percent tradable tax credit. The negotiated tax formula – referred to generally as the "20/20" PPT tax rate – was the subject of much debate throughout the 2006 regular and special sessions of the Alaska State Legislature. COMPANY A supported the 20/20 PPT tax rate legislation, and opposed legislation that contained a tax rate of greater than 20/20.

-5-

## THE CONSPIRACY

15.     Beginning in or about September 2005 and continuing until on or about

August 30, 2006, in the District of Alaska and elsewhere, defendants PETER KOTT and

BRUCE WEYHRAUCH, each an elected public official of the Alaska State Legislature,

together with COMPANY CEO, COMPANY VP, State Senator A, and others both

known and unknown to the grand jury, did knowingly and unlawfully conspire,

confederate, and agree together and with each other:

(A)     to obstruct, delay, and affect in any way and degree commerce and the

movement of any article and commodity in commerce by extortion, that is,

to unlawfully obtain or attempt to obtain under color of official right money

or other property from COMPANY A, COMPANY CEO, and COMPANY

VP with their consent for KOTT and WEYHRAUCH, not due KOTT or

WEYHRAUCH or each official's office, in agreement for the performance

of official acts, in violation of Title 18, United States Code, Section

1951(a);

(B)     to corruptly solicit and demand for the benefit of any person, and accept and

agree to accept, anything of value from any person for KOTT and

WEYHRAUCH each while an agent for the State of Alaska, an entity that

received more than $10,000 in federal funding during the calendar years

2005 and 2006, with the intent that KOTT and WEYHRAUCH would each

-6-

be influenced and rewarded in connection with any business, transaction or series of transactions of $5,000 or more of the State of Alaska, in violation of Title 18, United States Code, Section 666(a)(1)(B); and

(C)     to devise, intend to devise, and attempt to devise a scheme and artifice to defraud and deprive the State of Alaska of its intangible right to honest services and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted writing and sounds by communications in interstate commerce by means of wire, and to knowingly send and cause to be sent communications in the United States mails, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346.

## OBJECTS OF THE CONSPIRACY

16.     It was an object of the conspiracy for KOTT to solicit, and for COMPANY CEO and COMPANY VP to provide, money and other financial benefits in exchange for KOTT agreeing to perform, being influenced in performing, and ultimately performing official acts as a member of the Alaska State Legislature, for the purpose of furthering COMPANY A's business within the State of Alaska.

17.     It was a further object of the conspiracy for KOTT to solicit, and for COMPANY CEO and COMPANY VP to agree to provide, employment for KOTT with COMPANY A after KOTT left his position as a member of the Alaska State Legislature. It was a further goal of the conspiracy for WEYHRAUCH to solicit, and for COMPANY

CEO and COMPANY VP to agree to provide, employment and contract legal work for

WEYHRAUCH with the COMPANY after WEYHRAUCH left his position as a member

of the Alaska State Legislature.

18.    It was a further object of the conspiracy for KOTT to make interstate wire

communications, and for WEYHRAUCH to utilize the United States mails, in connection

with a scheme and artifice to defraud the State of Alaska of its intangible right to the

honest services of KOTT and WEYHRAUCH by receiving and attempting to receive

things of value from COMPANY CEO, COMPANY VP, and COMPANY A.

## MANNER AND MEANS OF THE CONSPIRACY

19.    In return for the money and other things of value that KOTT received and

attempted to receive, and that WEYHRAUCH attempted to receive, KOTT and

WEYHRAUCH each agreed to perform, attempted to perform, and actually performed

official acts as a member of the Alaska State Legislature that benefitted COMPANY

CEO, COMPANY VP, and COMPANY A and its clients.  Among other things and

without limitation, KOTT and WEYHRAUCH each performed the following acts to

execute the conspiratorial agreement:  (1) voting in favor of versions of the PPT bill

supported by COMPANY CEO, COMPANY VP, COMPANY A, and the oil producers;

(2) lobbying other elected public officials to support versions of the PPT bill that

COMPANY CEO, COMPANY VP, COMPANY A, and the oil producers favored; and

-8-

(3) offering to assist and help COMPANY CEO, COMPANY VP, and COMPANY A by providing official support for the natural gas pipeline legislation and the PPT bill.

20. With respect to KOTT, the co-conspirators effected the conspiracy by providing KOTT with illegal financial benefits through cash payments to KOTT and through inflated invoices prepared by Kott's Hardwood Flooring. The co-conspirators further effected the scheme through KOTT's demand for, and COMPANY A's agreement to provide KOTT with a job as a lobbyist after KOTT left the Alaska State Legislature. These things of value were in return for KOTT's agreement to perform, attempt to perform, and eventual performance of official acts to benefit COMPANY A.

21. With respect to WEYHRAUCH, the co-conspirators effected the scheme by agreeing to provide WEYHRAUCH with contractual legal work for COMPANY A, in response to WEYHRAUCH's written solicitation for such work from COMPANY A. In return, WEYHRAUCH worked with KOTT, COMPANY CEO, and COMPANY VP to agree to perform, attempt to perform, and ultimately perform official acts to benefit COMPANY A.

## OVERT ACTS

22. In furtherance of the conspiracy, and to effect its objects, the co-conspirators committed the following overt acts, among others, in the District of Alaska and elsewhere:

-9-

23.     On or about September 26, 2005, KOTT called COMPANY VP and said, "I need a job," to which COMPANY VP replied, "You've got a job, get us a pipeline."

24.     On or about September 26, 2005, in a subsequent conversation, in discussing the PPT tax issue and the natural gas pipeline legislation, KOTT again told COMPANY VP, "I just want to be the warden in Barbados," to which COMPANY VP replied that he wanted the "gas pipeline."

25.     In or about November, 2005, in a discussion between KOTT and COMPANY VP about whether another State Representative would support the anticipated gas pipeline legislation, KOTT agreed that he would "just get [that State Representative] on line" to support the pipeline.

26.     On January 8, 2006, prior to the start of the 2006 regular legislative session, KOTT called COMPANY CEO and left him a message that stated: "Things start tomorrow. I just wanted to get what our instructions are."

27.     On January 10, 2006, in a telephone call, KOTT assured COMPANY CEO that KOTT would deliver the gas pipeline legislation for COMPANY CEO as follows:

| KOTT: | I'm going to get this fucking gas line done so I can get out of here. |
|---|---|
| COMPANY CEO: | Get the gas, get the gas. |
| KOTT: | That's my commitment to you, so. |
| COMPANY CEO: | Okay. |
| KOTT: | I'll get her done. |

-10-

COMPANY CEO:   And I'll do the same thing to you.

28.     On or about February 20, 2006, in a discussion between COMPANY CEO
and COMPANY VP about COMPANY A's influence over KOTT, COMPANY CEO
admitted that "[w]e got more money in PETE KOTT than he can even think about it."

29.     On or about March 10, 2006, KOTT, using his cellular telephone to place a
call from Washington, D.C., where KOTT was having dinner with an oil executive, to
COMPANY VP, KOTT told COMPANY VP, "Well, you know where my allegiance is,
so you know, just . . .You're my best buddy, so you can count on it. . . . [T]hat's the reason
why I call you on this shit, all right?  So you fill me in on some of this shit that I'm not
aware of, so I appreciate that."

30.     On or about March 23, 2006, WEYHRAUCH called COMPANY A and left
a message with COMPANY CEO's secretary that WEYHRAUCH wanted to speak with
COMPANY CEO about the oil and gas tax and other development issues.

31.     On or about March 27, 2006, COMPANY CEO, COMPANY VP, and two
other executives from COMPANY A agreed to make contributions to support one of
KOTT's relatives in a local school board race, and explicitly discussed that such
contributions would help COMPANY A gain influence with KOTT.

32.     On or about March 29, 2006, KOTT met with COMPANY VP and
COMPANY CEO in Suite 604 and described how KOTT had attempted to gain leverage
over another member of the Alaska State Legislature by placing a "hold" on a bill that

was important to that state legislator, and how KOTT hoped to use that leverage to get support for COMPANY A's preferred version of the PPT tax bill.

33.     On or about March 29, 2006, in the same meeting described above, KOTT further told COMPANY CEO that KOTT would not release the "hold" until COMPANY CEO instructed KOTT to do so.

34.     On or about April 18, 2006, KOTT met with COMPANY VP in Suite 604 and told COMPANY VP – and COMPANY CEO, via teleconference – that KOTT had been successful in getting other legislators' support for the oil tax legislation, and that KOTT believed the oil tax would pass the legislature.

35.     On or about April 18, 2006, in the same meeting described above, KOTT explicitly linked his support of the gas pipeline and PPT tax issues with his receipt of things of value from COMPANY A, as KOTT told COMPANY VP and COMPANY CEO, "You'll get your gasline, the governor gets his bill, and I'll get my job in Barbados."

36.     On or about May 4, 2006, and while the Alaska State Legislature was in session, WEYHRAUCH mailed and caused to be mailed through the United States mails a resume and cover letter to COMPANY CEO in which WEYHRAUCH offered to provide legal services and representation to COMPANY A.

37.     On or about May 4, 2006, during a conversation in Suite 604, COMPANY CEO, COMPANY VP, and a lobbyist discussed the fact that WEYHRAUCH had

-12-

solicited COMPANY CEO for legal work with COMPANY A, but that the matter should not be discussed outside Suite 604.

38.     On or about May 4, 2006, during a conversation in Suite 604, COMPANY CEO and COMPANY VP discussed whether COMPANY A should hire WEYHRAUCH, and agreed that they believed WEYHRAUCH's job solicitation was connected to whether or not WEYHRAUCH would support COMPANY A's preferred version of the PPT tax bill.

39.     On or about May 4, 2006, during the same conversation in Suite 604, COMPANY CEO and COMPANY VP agreed that, in response to WEYHRAUCH's job solicitation, they would tell WEYHRAUCH to meet with COMPANY CEO in Anchorage after the legislative session ended to discuss the possibility of providing COMPANY A legal work to WEYHRAUCH.

40.     On or about May 5, 2006, during a conversation between KOTT and COMPANY VP, KOTT asked COMPANY VP" are we going to get WEYHRAUCH?," and told COMPANY VP that WEYHRAUCH had told KOTT that WEYHRAUCH had applied for a legal position with COMPANY A.

41.     On or about May 5, 2006, after WEYHRAUCH called COMPANY CEO and told COMPANY CEO that the state legislators needed to "hold the line" on the 20/20 PPT tax rate, COMPANY CEO stated, "When session is over you need to come up and talk to me" – to which WEYHRAUCH replied, "I'll do that right away."

42.     On or about May 7, 2006, in a meeting with COMPANY CEO and
COMPANY VP in Suite 604 about KOTT's continued efforts to support the 20-percent-
tax version of the PPT legislation, KOTT admitted that if it were not for COMPANY
CEO, KOTT would be supporting a much higher 30 percent tax for the PPT bill.

43.     On or about May 7, 2006, after WEYHRAUCH had mistakenly voted the
"wrong way" on an amendment to the PPT bill that COMPANY A and the oil producers
did not support, WEYHRAUCH switched his vote relating to the amendment after
receiving instructions to do so from KOTT and COMPANY CEO.

44.     On or about May 7, 2006, after the amendment described in paragraph 43,
above, was defeated, KOTT met with COMPANY CEO and COMPANY VP in Suite 604
and described how KOTT had lied to another member of the Alaska State Legislature in
order to kill the amendment as follows: "I got [COMPANY CEO] [pointing to one side of
him], I got [the other state legislator] [pointing to the other side] . . . I use 'em and abuse
'em."

45.     On or about May 7, 2006, in the same meeting in Suite 604, KOTT
admitted that the reason he sought to defeat the amendment was because COMPANY
CEO asked him to do so as follows: "I had to get 'er done. So, I had to come back and
face this man right here [pointing to COMPANY CEO]. I had to cheat, steal, beg,
borrow, and lie." In response, COMPANY CEO told KOTT, "I own your ass."

46.     On or about May 8, 2006, KOTT and WEYHRAUCH had a telephone call with COMPANY VP in which KOTT and WEYHRAUCH gave COMPANY VP a status update regarding the PPT bill, and discussed how to maneuver the 20/20 PPT bill through both the House and the Senate – including talking to Senator A about the issue.

47.     On or about May 8, 2006, KOTT went to Suite 604 to give COMPANY CEO and COMPANY VP an update on the PPT bill, and told COMPANY CEO and COMPANY VP that KOTT was concerned about whether WEYHRAUCH would support the PPT 20 percent tax version.

48.     On or about May 8, 2006, in a conversation between COMPANY CEO and WEYHRAUCH about the PPT tax version, although WEYHRAUCH told COMPANY CEO that WEYHRAUCH thought a 21 percent tax was a "political reality," WEYHRAUCH told COMPANY CEO that WEYHRAUCH would follow KOTT and cast his vote alongside KOTT's vote.

49.     On or about May 9, 2006, in a conversation between COMPANY CEO and COMPANY VP in Suite 604, COMPANY CEO told COMPANY VP that they would have to give WEYHRAUCH some contract legal work if the 20 percent PPT bill passed the Alaska State Legislature.

50.     On or about May 16, 2006, COMPANY CEO sent an e-mail to multiple members of the Alaska State Legislature, including KOTT and WEYHRAUCH, in which COMPANY CEO asked each member to vote for the 20 percent PPT bill.

-15-

51. On or about May 19, 2006, WEYHRAUCH sent COMPANY CEO a reply e-mail that stated in part, "I will be arriving in Anchorage on Wednesday May 24 and would like to meet with you at 4 pm to discuss a mutually beneficial relationship."

52. On or about May 19, 2006, WEYHRAUCH called COMPANY A and, through COMPANY CEO's secretary, scheduled a meeting between WEYHRAUCH and COMPANY CEO on May 24, 2006.

53. On or about May 24, 2006, in preparing for a meeting that afternoon with WEYHRAUCH, COMPANY CEO and COMPANY VP agreed that they needed WEYHRAUCH's vote on the PPT legislation, and decided to "string [WEYHRAUCH] out for a while" and "stall a little bit" before providing WEYHRAUCH with legal contract work from COMPANY A.

54. On or about May 24, 2006, WEYHRAUCH, COMPANY VP and COMPANY CEO met for several hours at a restaurant at a hotel in Anchorage, Alaska, and discussed, among other things, WEYHRAUCH's request for employment with COMPANY A and WEYHRAUCH's support of the 20 percent PPT legislation.

55. On or about May 24, 2006, during the same meeting with COMPANY CEO and COMPANY VP, WEYHRAUCH told COMPANY CEO that WEYHRAUCH was not doing well financially.

56. On or about May 25, 2006, COMPANY VP told a lobbyist for one of the oil producers that COMPANY CEO had met with WEYHRAUCH the evening before; that

-16-

the relationship with WEYHRAUCH was "going well"; that COMPANY A was keeping WEYHRAUCH in a good place; and that "BRUCE will be good."

57.     On or about May 30, 2006, WEYHRAUCH, in a handwritten note to COMPANY CEO on Alaska State Legislature letterhead, stated, "It was great to finally spend some time with you and [COMPANY VP] last week. Call anytime. I look forward to working with you and COMPANY A in the future."

58.     On or about June 1, 2006, in Suite 604, COMPANY CEO handed KOTT approximately $1,000 in cash.

59.     On or about June 1, 2006, during the same meeting in Suite 604 described above, when KOTT told COMPANY CEO that KOTT wanted to be a lobbyist after leaving the Alaska State Legislature, COMPANY CEO told KOTT, "Well, you will be."

60.     On or about June 4, 2006, during a special session of the Alaska State Legislature, KOTT and WEYHRAUCH worked together to seek an adjournment of the June 4, 2006, session of the Alaska House of Representatives before a vote could be taken on an amendment to the PPT bill that COMPANY A and the producers did not support.

61.     On or about June 5, 2006, WEYHRAUCH told COMPANY VP that the PPT bill appeared to be coming along poorly, and that it was "real frustrating" given what WEYHRAUCH had done to try to further COMPANY A's interests concerning the PPT bill.

-17-

62.     On or about June 5, 2006, in a telephone conversation between State
Senator A and COMPANY CEO concerning the PPT bill, State Senator A and
COMPANY CEO agreed that WEYHRAUCH came to support the version of the PPT bill
favored by COMPANY A because COMPANY CEO told him that COMPANY A would
give WEYHRAUCH some legal work.

63.     Between on or about June 4, 2006 and June 6, 2006, KOTT met multiple
times with COMPANY VP and COMPANY CEO to discuss "killing" a version of the
PPT bill that was unfavorable to COMPANY CEO, and to discuss KOTT coordinating
his actions with State Senator A.

64.     On or about July 12, 2006, COMPANY VP and KOTT had a telephone
conversation in which they discussed whether KOTT's campaign manager had told KOTT
that COMPANY A had hired Polling Company to conduct a poll for KOTT:

COMPANY VP:     [KOTT's campaign manager] told you about the
                [Polling Company] poll, right?

KOTT:           Yeah.

COMPANY VP:     I talked to [Polling Company] today, it's all square and
                if you need to do something you know later we're in on
                that too.  So, I told those two guys, [KOTT's campaign
                manager] and [Polling Company], to get a hold of you
                if you need to do something, talk about it and we'll take
                care of that too.  Okay?

KOTT:           All right.

-18-

65.     On or about July 12, 2006, COMPANY VP spoke with Polling Company and arranged for Polling Company to conduct a poll for KOTT's campaign for re-election to the Alaska State Legislature, but to bill COMPANY A – through COMPANY VP – for the cost of KOTT's poll.

66.     On or about July 12, 2006, Polling Company prepared an invoice for a poll for KOTT's re-election campaign, but addressed the invoice to COMPANY VP.

67.     Between on or about July 12, 2006, and on or about August 30, 2006, COMPANY A wrote a $2,750 check to Polling Company to pay the invoice referenced in ¶ 66.

68.     On or about July 19, 2006, during a telephone conversation, WEYHRAUCH told COMPANY VP that his "mission" was to "shoe-horn[]" himself into a meeting of legislators that were studying a new proposal for the PPT bill, learn about the details of the new PPT proposal, and then to report those details to COMPANY VP and COMPANY CEO.

69.     On or about July 22, 2006, during a telephone conversation between COMPANY VP and PETE KOTT, KOTT and COMPANY VP acknowledged that they both had spoken to WEYHRAUCH about the new PPT proposal.

70.     On or about July 30, 2006, COMPANY VP told KOTT that the results of the poll would be sent to KOTT later that day, and confirmed that COMPANY A – not KOTT or KOTT's campaign – paid for the cost of the poll.

-19-

71.     On or about July 31, 2006, after learning from KOTT that KOTT needed

money, COMPANY CEO and COMPANY VP discussed how they could get money to

KOTT:

COMPANY CEO:   [KOTT] needs more money, I think.

COMPANY VP:    Uh, I'll talk to PETE about it, okay?  He's supposed to
               get with me in the next, oh, couple of hours
               (unintelligible).

COMPANY CEO:   Well, we've got to figure out a way to get, uh, his son
               some money, and I don't know exactly how to do that.

COMPANY VP:    Well, I'll talk to PETE about it.

COMPANY CEO:   Okay.

72.     On or about July 31, 2006, COMPANY CEO and KOTT discussed how to

come up with a "foolproof" plan to get KOTT the additional money.

73.     On or about August 2, 2006, COMPANY VP directed an employee of

COMPANY A to pay a fraudulently inflated invoice, totaling $7,993, sent to COMPANY

A on behalf of Kott's Hardwood Flooring.

74.     Between on or about August 2, 2006 and on or about August 30, 2006, a

check for $7,993 – dated July 31, 2006, and drawn from COMPANY CEO's personal

bank account – was deposited into a bank account related to Kott's Hardwood Flooring.

75.     On or about August 23, 2006, WEYHRAUCH, in a letter to COMPANY

CEO that was prepared on Alaska State Legislature letterhead, stated in part, "I

mentioned to [COMPANY VP] that if you and he are available to get together to discuss

pipeline or any other development issues, I would be pleased to accommodate your schedules."

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### INTERFERENCE WITH COMMERCE BY EXTORTION INDUCED UNDER COLOR OF OFFICIAL RIGHT (18 U.S.C. § 1951(a) and § 2) (DEFENDANT PETER KOTT)

76.     Paragraphs 1-14 and 22-75 of Count One are realleged and incorporated by reference as though fully set forth herein.

77.     Between in or about September 2005 and on or about August 30, 2006, in the District of Alaska and elsewhere, the defendant,

### PETER KOTT,

an elected member of the Alaska State Legislature, did knowingly obstruct, delay and affect in any way and degree commerce and the movement of articles and commodities in interstate commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, KOTT unlawfully obtained and attempted to obtain from COMPANY CEO, COMPANY VP, and COMPANY A, with KOTT's consent under color of official right, $8,993 in monetary payments, $2,750 in polling expenses, and a future contract as a lobbyist for COMPANY A, not due KOTT or his office, in agreement that KOTT would perform official acts in exchange for the monetary payments from COMPANY CEO, COMPANY VP, and COMPANY A.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT THREE

### ATTEMPTED INTERFERENCE WITH COMMERCE BY
### EXTORTION INDUCED UNDER COLOR OF OFFICIAL RIGHT
### (18 U.S.C. § 1951(a) and § 2)
### (DEFENDANT BRUCE WEYHRAUCH)

78.     Paragraphs 1-14 and 22-75 of Count One are realleged and incorporated by reference as though fully set forth herein.

79.     Between in or about March 2006 and on or about August 30, 2006, in the District of Alaska and elsewhere, the defendant,

### BRUCE WEYHRAUCH,

an elected member of the Alaska State Legislature, did knowingly attempt to obstruct, delay, and affect in any way and degree commerce and the movement of articles and commodities in interstate commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, WEYHRAUCH unlawfully attempted to obtain from COMPANY CEO, COMPANY VP, and COMPANY A, with WEYHRAUCH's consent under color of official right, a future contract to perform legal work for COMPANY A, not due WEYHRAUCH or his office, in agreement that WEYHRAUCH would perform official acts in exchange for the future contract to perform legal work from COMPANY CEO, COMPANY VP, and COMPANY A.

All in violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT FOUR

## BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS
### (18 U.S.C. § 666(a)(1)(B) and § 2)
### (DEFENDANT PETER KOTT)

80.      Paragraphs 1-14 and 22-75 of Count One are realleged and incorporated by reference as though fully set forth herein.

81.      In calendar years 2005 and 2006, the State of Alaska received in excess of $10,000 from the United States government under Federal programs involving grants, subsidies, loans, guarantees, insurance, and/or other forms of Federal assistance.

82.      Between in or about September 2005 and on or about August 30, 2006, in the District of Alaska and elsewhere, the defendant,

### PETER KOTT,

an elected member of the Alaska State Legislature and an agent of the government of the State of Alaska, did knowingly and corruptly solicit, demand, accept, and agree to accept something of value from COMPANY CEO, COMPANY VP, and COMPANY A, intending to be influenced and rewarded in connection with a business, transaction, or series of transactions of $5,000 or more of the State of Alaska.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

## COUNT FIVE

### BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS
### (18 U.S.C. § 666(a)(1)(B) and § 2)
### (DEFENDANT BRUCE WEYHRAUCH)

83.     Paragraphs 1-14 and 22-75 of Count One are realleged and incorporated by reference as though fully set forth herein.

84.     In calendar year 2006, the State of Alaska received in excess of $10,000 from the United States government under Federal programs involving grants, subsidies, loans, guarantees, insurance, and/or other forms of Federal assistance.

85.     Between in or about March 2006 and on or about August 30, 2006, in the District of Alaska and elsewhere, the defendant,

### BRUCE WEYHRAUCH,

an elected member of the Alaska State Legislature and an agent of the government of the State of Alaska, did knowingly and corruptly solicit, demand, and agree to accept something of value from COMPANY CEO, COMPANY VP, and COMPANY A, intending to be influenced and rewarded in connection with a business, transaction, or series of transactions of $5,000 or more of the State of Alaska.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

//   //


//   //


-24-

## COUNTS SIX AND SEVEN

### HONEST SERVICES MAIL AND WIRE FRAUD
### (18 U.S.C. §§ 1341, 1343, and 1346 and § 2)
### (DEFENDANTS PETER KOTT AND BRUCE WEYHRAUCH)

86.     Paragraphs 1-14 and 22-75 of Count One are realleged and incorporated by reference as though fully set forth herein.

### The Scheme

87.     Between in or about September 2005 and on or about August 30, 2006, in the District of Alaska and elsewhere, the defendants, **PETER KOTT and BRUCE WEYHRAUCH**, along with COMPANY CEO and COMPANY VP, aided and abetted by one another, devised, attempted to devise, and intended to devise a scheme and artifice to defraud and deprive the State of Alaska of its intangible right to the honest services of KOTT and WEYHRAUCH, performed free from deceit, self-dealing, bias, and concealment.

### The Purpose of the Scheme

88.     The purpose of the scheme was for COMPANY CEO and COMPANY VP to provide, or agree to provide, things of value to KOTT and WEYHRAUCH to cause KOTT and WEYHRAUCH each to abuse his position and office as a member of the Alaska State Legislature, and to misuse his official authority for the benefit of COMPANY CEO, COMPANY VP, and COMPANY A.

-25-

## Use of the Mails and Interstate Wires

89.    For the purpose of executing the scheme and artifice to defraud, in the

District of Alaska and elsewhere, KOTT did knowingly transmit and cause to be

transmitted certain sounds and signals by means of interstate wire, as set forth below:

| COUNT | DATE | INTERSTATE WIRE COMMUNICATION |
|---|---|---|
| 6 | March 10, 2006 | Call placed by KOTT from Washington, D.C., to COMPANY VP in Alaska, to discuss legislation before the Alaska State Legislature and to affirm KOTT's commitment to COMPANY VP |

90.    For the purpose of executing and attempting to execute the scheme and

artifice to defraud, in the District of Alaska and elsewhere, WEYHRAUCH did

knowingly place and cause to be placed in a post office and authorized depository for

mail matter or used a private interstate commercial carrier, the matter and things listed

//   //

//   //

//   //

//   //

-26-

below to be sent and delivered by the United States Postal service or commercial carrier:

| COUNT | DATE | ITEM MAILED OR DELIVERED |
|-------|------|--------------------------|
| 7 | May 4, 2006 | Resume and cover letter soliciting a position of employment from COMPANY A |

All in violation of Title 18, United States Code, Sections 1341, 1343, 1346, and 2.

A TRUE BILL.

s/ Grand Jury Foreperson
GRAND JURY FOREPERSON

WILLIAM M. WELCH II
Chief, Public Integrity Section

s/ William M. Welch II by Nicholas A. Marsh
NICHOLAS A. MARSH
EDWARD P. SULLIVAN
Trial Attorneys
Public Integrity Section
United States Department of Justice
1400 New York Ave. NW, 12th Floor
Washington, DC  20005
(202) 514-1412

s/ Joseph W. Bottini
JOSEPH W. BOTTINI
JAMES A. GOEKE
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500

DATED:  May 3, 2007