**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

**UNITED STATES OF AMERICA**,

v.

**PETER KOTT,**

Defendant.

Case No. 3:07-cr-00056-JWS

## UNITED STATES' RESPONSE
## OPPOSING DEFENDANT KOTT'S MOTION TO DISMISS

Defendant Peter Kott asks this Court to vacate his convictions and dismiss the indictment based on his claims that the government violated his constitutional right to access certain information before trial. Dkt. 404. For the reasons set forth below, however, Kott has not established a constitutional discovery violation warranting a new trial, much less dismissal. This Court should therefore deny Kott's motion.

## I. INTRODUCTION

After deliberating for only one day at the conclusion of a 14-day trial, a jury convicted Kott of committing multiple acts of public corruption. The jury convicted him because, as this Court has acknowledged, "[t]he evidence against Kott at trial was overwhelming . . . ." (Dkt. No. 35, p.2) (denying Kott's motion for bail pending appeal). Indeed, the jury observed Kott on no less than 56 audio and video recordings brazenly taking money from oil executives in exchange for official acts. The jury heard Kott boasting that he "had to cheat, steal, beg, borrow, and lie," and would "sell his soul to the devil" in order to pass legislation favorable to a company whose two principals had promised him a future job, and had given him over $11,000 in cash and other things of value. The jury also heard Kott admit that he and one of these oil executives ordered hats with the emblem,

"CBC," which stood for "Corrupt Bastards Club." In his motion, Kott fails to address the overwhelming evidence of his guilt, and instead asserts that he is entitled to dismissal based on bits of information selectively picked from the prosecutors' files.[1]

The Ninth Circuit charged this Court with the responsibility of determining in this case: "(1) whether the government breached its obligation of full disclosure under *Brady* [*v. Maryland*, 373 U.S. 83 (1963),] and *Giglio v. United States*, 405 U.S. 150, 154 (1972); (2) if so, whether the defendant was prejudiced by the violation; and (3) if the defendant was prejudiced, what the remedy should be." *United States v. Peter Kott*, 9th Cir. No. 07-30496 (Dkt. No. 6951927). The information Kott cites, however, falls far short of establishing a *Brady* or *Giglio* violation. Kott anchors his motion to: 1) witness statements made two years after trial; 2) defense counsel's arguments in a subsequent, unrelated case; and 3) allegations about a government witness that may produce titillating headlines, but are inadmissible and have no evidentiary value in this case. However, even viewing this information in a light most favorable to Kott, and taken individually or collectively, Kott has not met his burden of establishing a reasonable probability that had the information been disclosed, the jury would have reached a different verdict. *See Brady*, 373 U.S. at 87 (holding that the government must disclose evidence that is favorable to an accused *and* material to guilt or punishment), *and United States v. Bagley*, 473 U.S. 667, 682 (1985) (holding that

---

[1] The government has given Kott extraordinary access to the prosecutors' files since the time it moved to remand this case. The government has provided Kott not only materials that appeared at the time of the remand to be information that it may have been required to disclose before trial (thus prompting the government's motion to remand), but also a significant amount of additional material that lay beyond any constitutional or statutory obligation of disclosure. The government did so, given the unique circumstances of this case, in order to assure the defendant, the Court, and the public that the Department of Justice takes its discovery obligations seriously and to allow Kott the fullest possible opportunity to evaluate the fairness of his trial.

"materiality" means that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). Moreover, Kott has failed to satisfactorily allege, let alone prove for the purposes of this post-remand litigation, that the government engaged in any willful misconduct warranting outright dismissal. Even assuming that Kott could establish willful government misconduct (which we do not in any way concede and, to be clear, strenuously deny), Kott has still failed to show that this new information undermines the jury's verdict.

Indeed, Kott's main legal analysis consists of a chart juxtaposing testimony at trial (taken out of context) with quotes from recently disclosed information (also taken out of context). Juxtaposing isolated quotes alone, however, cannot establish a reasonable probability that the jury would have reached a different verdict if the information had been disclosed. Instead, a careful analysis of the facts and the controlling case law, which we summarize below, clearly establishes that none of the information upon which Kott relies undermines confidence in the jury's verdict. Accordingly, Kott's motion to dismiss should be denied.

## II.    PROCEDURAL BACKGROUND

Prior to Kott's trial, the government did not disclose the 302s of witnesses Bill Allen or Rick Smith. The government did turn over Kott's 302, as well as all pertinent recordings from the investigation, including a large volume of Title III material, a small part of which was presented at trial.

On September 25, 2007, a jury returned guilty verdicts against Kott on the following three felony charges involving public corruption:

1.    Conspiracy to commit extortion under color of official right, bribery, and honest services mail and wire fraud, in violation of 18 U.S.C. § 371;

2. Interference with commerce by extortion induced under color of official right, in violation of 18 U.S.C. §§ 1951(a) and 2; and

3. Bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2.

These charges against Kott were based on his many official acts involving the petroleum production tax ("PPT"), or gas pipeline legislation, which he performed in exchange for a variety of bribes provided by Bill Allen and Rick Smith, the CEO and VP of Government Affairs for VECO, respectively. These bribes included: Allen's $1,000 cash payment reimbursing Kott for a contribution to Frank Murkowski's gubernatorial campaign; $2,750 in polling expenses that VECO paid for Kott's re-election campaign; a promise of employment after Kott left the legislature; and, a $7,993 payment from Allen to Kott for the purpose of compensating Kott's son, Pete Kott Jr., for his work on defendant Kott's re-election campaign.

While Kott's direct appeal was still pending, the government initiated its own review of discovery in this case. On June 4, 2009, the government filed a motion with the United States Court of Appeals for the Ninth Circuit to remand the case in order to allow this Court to address in the first instance the discovery of material which appeared to be information that the government may have been required to disclose before trial. *See United States v. Peter Kott*, 9th Cir. No. 07-30496 (Dkt. No. 6945793).

On June 10, 2009, as described above, the Ninth Circuit granted the government's motion to remand. Before and after the remand, the government reviewed thousands of documents and exhibits with potential pertinence to the "Polar Pen" investigations that spawned the case against Kott. Consistent with the government's desire to provide Kott with the fullest possible opportunity to evaluate the fairness of his trial, the government disclosed to Kott thousands of pages of

documents that lay beyond any constitutional or statutory requirement of disclosure in order to ensure confidence in the Department's commitment to justice.

### III.    APPLICABLE LAW

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  In *Giglio*, the Supreme Court extended this principle to include evidence that impeaches a witness' credibility.  405 U.S. at 154.  The Court later explained that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also id.* at 678 (conviction should be reversed "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial").  Because materiality is defined by measuring the degree to which suppressed evidence "undermine[s] confidence in the outcome," a materiality analysis necessarily demands that the probative value of the suppressed evidence be weighed against the government's evidence at trial, since the stronger the government's evidence is at trial the less probable it is that suppressed evidence favorable to the accused would have affected the jury's verdict.  *See United States v. Agurs*, 427 U.S. 97, 112-13 (1976) ("[T]he omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about the guilt whether or not the additional evidence is considered, there is no justification for a new trial.").

In *Bagley*, the Supreme Court's seminal ruling on materiality, the Court cautioned that "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence

favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . ." 473 U.S. at 675 (footnote omitted). The Court further brightened the line of the materiality standard's limits, stating "[w]e do not . . . automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . ." *Id.* at 677 (quoting *Giglio*, 405 U.S. at 154); *see also id.* at 675 n.7 ("[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments."). Finally, the Court explained in unequivocal terms that it consciously designed its materiality standard to be narrow in scope. *Id.* at 675 n.7 ("An interpretation of *Brady* to create a broad, constitutionally required right of discovery 'would entirely alter the character and balance of our present system of criminal justice.'" (quoting *Giles v. Maryland*, 386 U.S. 66, 117 (1967) (Harlan, J., dissenting))).[2]

Finally, it is worth noting that in every *Brady* case in which the Supreme Court or the Ninth Circuit has overturned a verdict, the Courts have attached considerable significance to the weakness

---

[2] The Court's admonition against an elastic materiality standard, however, is not limited to *Bagley*. A decade earlier, the Court cautioned that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109-10; *see also id.* at 111-12 ("[T]he judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. . . . . Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant."). Ten years after *Bagley*, the Court reaffirmed this principle when it declared that "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *see also id.* at 437 ("We have never held that the Constitution demands an open file policy (however such a policy might work out in practice), and the rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate.").

of the government's evidence in those cases, which made the issue of guilt a close call at trial. *See,* *e.g.*, *Kyles*, 514 U.S. at 454 ("This is not the 'massive' case envisioned by the dissent; it is a significantly weaker case than the one heard by the first jury, which could not even reach a verdict.") (internal citation omitted); *United States v. Chapman*, 524 F.3d 1073, 1080 (9th Cir. 2008) ("[T]he government's case to date had been quite weak . . . ."); *id.* at 1087 ("[T]he case as originally prosecuted appeared to the district court to have been faltering."); *United States v. Kojayan*, 8 F.3d 1315, 1322 (9th Cir. 1993) ("This case was close, and we find a 'reasonable probability' that, had this evidence been disclosed, the result would have been different; the evidence was therefore material."); *see also id.* at 1323 ("This was a close case: The jury deliberated for over two days after a one-and-a-half-day trial."). This Court has already correctly determined that Kott's case was not a close one, and "[t]he evidence against Kott at trial was overwhelming . . . ." (Dkt. No. 35, p. 2).

IV.    SUMMARY OF THE EVIDENCE AT TRIAL

The evidence at trial in this case was overwhelming. The 56 audio and video recordings presented at trial captured corrupt payments and conversations detailing the corrupt relationship between Kott and Allen and Smith, and the influence that Allen and Smith wielded over Kott. The more compelling moments captured on audio and video include Kott admitting to Allen and Smith that he worked to defeat an amendment to the PPT that VECO opposed because Allen asked him to do so, declaring, "I had to get 'er done. So, I had to come back and face this man right here [pointing to Allen]. I had to cheat, steal, beg, borrow, and lie." Later in the same conversation, Kott twice stated that he had "sold [his] soul to the devil." Removing any doubt about whom Kott was referring to, Allen responded, "I own your ass." Kott Tr. Vol. 12, pp. 111-13.

On January 8, 2006, prior to the start of the 2006 regular legislative session, Kott left a

telephone message for Smith asking for his instructions regarding the PPT legislation. Two days later, on January 10, 2006, Kott discussed his prospects for future employment with Allen while assuring Allen that he would deliver the gas pipeline legislation Allen wanted. Kott declared, "I'm going to get this [expletive] gas line done so I can get out of here. . . . . That's my commitment to you. . . . . I'll get her done." Allen responded, "And I'll do the same thing to you." Kott Tr. Vol. 6B, p. 49 (Sept. 12, 2007).

In a recorded conversation on May 7, 2006, Kott, Allen, and Smith discussed Kott's continued efforts to support the 20% tax for the PPT. Kott Tr. Vol. 12, pp. 110-14 (Sept. 20, 2007). During this meeting, which took place after Kott had successfully manipulated the defeat of an amendment to the PPT that Allen disliked, Kott described to Allen and Smith how he had lied to a colleague in the legislature in order to kill the amendment. Kott said, "I hate to [expletive] [State Representative] Ethan [Berkowitz], but hey, I got Allen [pointing to one side of him], I got Ethan [pointing to the other side of him] . . . I use 'em and abuse 'em." *See id.* at 111-13. Kott also explained to Allen and Smith that if it were not for Allen, Kott would be supporting a much higher 30% tax for the PPT. *Id.* at 110-14.

In addition to the recordings presented at trial, Kott made key admissions in an August 2006 interview with the FBI, which the government introduced in its case-in-chief, and when Kott exercised his right to testify at trial. Kott's admissions are particularly important not only because they are strong evidence of his guilt, but because they completely contradict the meaning and significance he now seeks to ascribe to the various notes and commentaries on which he relies in his motion. A summary review of these admissions is revealing:

- At trial, Kott admitted that "[Allen] asked me to make a campaign contribution to the Murkowski campaign," said "he would pay me back," and then "[Allen] approached

me and said here's what I owe you." Kott Tr. Vol. 11, p. 118 (Sept. 19, 2007).

- Kott also admitted that he "learned during [his campaign] that Rick Smith had ordered a poll . . . on [his] campaign . . . ." Kott Tr. Vol. 12, p. 82 (Sept. 20, 2007). Kott further admitted that he read and discussed the results of the poll prior to his election. *Id.* at 165.

- Kott admitted that he gave $7,000 of the inflated flooring invoice to his son, which allowed his son to work on his campaign, although he claimed that the money obligated his son to perform work at Smith's and Allen's home at some unspecified point in the future. *Id.* at 115, 172-76.

- Kott testified about the official acts he took on Allen's behalf and undermined his own credibility by admitting to acts of deceit in order to satisfy Allen. When discussing how he deceived colleagues in the legislature in order to secure legislation favorable to VECO and Allen, Kott confessed: "I didn't feel real comfortable about what occurred, at least from my perspective. From an ethical perspective, I kind of violated what I would perceive as my ethics in dealing with other individuals." *Id.* at 8.

- Kott also conceded that he and Rick Smith ordered a dozen or so hats with the emblem "CBC," which stood for "Corrupt Bastards Club." *Id.* at 103-10. When asked on cross-examination whether he was "willing to sacrifice the principle of telling the truth to your friends," Kott responded, "[t]o some extent, yes." *Id.* at 156; *see also id.* at 193 ("[L]ying to your friends is not a good thing. But I believe you just can't compromise your principles, and if I have the choice of compromising my principles [which Kott defined in this context as impressing Allen and Smith] or lying to my friends, lying to my friends is going to take the backseat.").

Kott fails to address these admissions in his motion to dismiss, and acknowledges only in passing the countless hours of video and audio recordings: "Certainly there were recordings. But the witnesses differed as to the meaning of those recordings." Mot. at 1. The recordings (as well as Kott's admissions), however, speak largely for themselves. Moreover, the fallacy of Kott's approach is that it wrongly assumes that the universe of information related to his case is limited to the information he has selected to support his motion. When the information upon which Kott relies is viewed in its proper context, along with the evidence at trial, it is clear that such information simply does not undermine confidence in the jury's verdict.

Perhaps for that reason, Kott does not fairly characterize the record or the government's evidence at trial. As just one example, the opening line of his motion states: "In closing argument, the government used a single word to describe the key issue in this case: 'Credibility.'" Mot. at 1, 57. In that sentence, Kott implies that the government was referring to the credibility of its own witnesses. The government made this reference to "credibility," however, halfway through its rebuttal and it was a challenge to *Kott's* credibility. Kott Tr. Vol. 14, p. 85 (Sept. 24, 2007). Specifically, the government argued that it was not credible for Kott to claim that he was not acting at the behest of Bill Allen and Rick Smith because he supported an amendment to raise the PPT tax rate to 21% at the end of the session. Indeed, Kott's own recorded statements, and all the other evidence, demonstrated that (1) Kott was pushing the 20/20 PPT tax scheme that Allen and Smith wanted, and (2) Kott's support for the 21% amendment was actually a strategic move consistent with the loyalty Allen and Smith had paid for.[3]

Nothing about the information upon which Kott now relies diminishes the overwhelming nature of the evidence the government presented against him at trial, and his motion should be denied.

## V.    ANALYSIS

As explained above, the Ninth Circuit remanded Kott's case to the district court to determine: "(1) whether the government breached its obligation of full disclosure under *Brady* and *Giglio*; (2)

---

[3] *See* Kott Tr. Vol. 14, p. 85 ("[Kott] says he's a 20.20 on the tapes, he says he's 20.20 repeatedly with Rick Smith and Bill Allen, he works for 20.20, he tells Representative LeDoux that he's a 20.20, but here today when you guys are sitting here he wants you to believe he was really in favor of the votes that you know he didn't cast the way he claims he did. Credibility. These were choices, ladies and gentlemen, choices that Mr. Kott made at the time, the choices that the government captured on tape, choices that he did not know were being recorded.").

if so, whether the defendant was prejudiced by the violation; and (3) if the defendant was prejudiced, what the remedy should be." *United States v. Peter Kott*, 9th Cir. No. 07-30496 (Dkt. No. 6951927) (citation omitted). In his motion, Kott (1) addresses one-half of the first issue (whether newly disclosed information was "favorable" to him) while ignoring the other half ("materiality"), and (2) then, apparently assuming the newly disclosed information was material, he skips ahead to his proposed remedy.[4] Indeed, Kott rarely addresses the concept of materiality in his motion, instead providing a tautological definition of "reasonable probability" near the conclusion of his motion, followed by a simple assertion that the government's nondisclosures were material. *See* Mot. at 55-56 ("A 'reasonable probability' does not require proof by a preponderance of evidence. It requires only proof of a probability. . . . . The undisclosed substantive and impeachment evidence was material under this test.") (citations omitted). Kott's motion, moreover, only mentions the word "prejudice" once, and there he misstates the law. *Id.* at 56 ("The sufficiency of other, admitted, evidence, has no bearing on the prejudice inquiry when a *Brady* violation is at issue.").

Tellingly, Kott's attempt at a *Brady* analysis is captioned: "The Newly Released Documents Show That the Government Violated its Constitutional and Ethical Duties to Disclose Evidence *Favorable* to the Defense." Mot. at 45 (emphasis added). While some of the undisclosed

---

[4] Although in its remand order the Ninth Circuit appears to bifurcate *Brady* obligations and prejudice into two separate issues, prejudice is part of the materiality analysis and therefore an inseparable element of *Brady*. *See, e.g., United States v. Si*, 343 F.3d 1116, 1122 (9th Cir. 2003) ("The Supreme Court has identified the three components of a *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. Prejudice is shown only if the withheld evidence is material to the defendant's guilt or punishment, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (citations and internal quotation marks omitted).

information may have been favorable to Kott, "favorability" is only the first half of the disclosure obligation under *Brady*. Kott either makes the mistake of conflating "favorability" with "materiality," or removes the word, "material," from the Court's holding in *Brady*. By doing so, Kott fails to fully address the Ninth Circuit's remand order and attempts to impose on the government a burden that the Supreme Court has repeatedly and unequivocally ruled is not required by *Brady*. *See, e.g.*, *Bagley*, 473 U.S. at 675 n.7 ("[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments."). Kott is required to make a factually-based showing of materiality by weighing the exculpatory impact of specific newly-disclosed information against the strength of the government's evidence at trial to determine whether confidence in the jury's verdict has been undermined. He has not done so.[5]

---

[5] Kott similarly fails to establish a *Giglio* violation. In *Giglio*, the Supreme Court held that *Brady* principles extended to evidence affecting government witness' credibility. *Id.* at 153-55. Kott nowhere explains how the probative value of any impeachment material, even if improperly suppressed, could have affected the jury's verdict in light of the strength of the government's evidence at trial.

Similarly, at the end of his motion, Kott asserts (Mot. at 55-57) without any analysis that the government erred under *Napue v. Illinois*, 360 U.S. 264 (1959). *Napue* applies, however, whenever a prosecution "'knew or should have known that . . . testimony was false.'" *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir.2005) (en banc) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir.2003)). As we make clear below, there was no false testimony or evidence in this case, therefore there could have been no *Napue* errors. Mot. at 57.

A.      **The Evidence of Kott's Guilt at Trial Was So Overwhelming, and the Exculpatory Nature of the Information He Now Identifies So Insignificant, that the Jury's Verdict Could Not Have Been Undermined**

Considering each of the categories of documents and information upon which Kott now relies in light of the evidentiary backdrop of an "overwhelming" case against him, it is clear that there were no *Brady* violations in this case.

1.      **Summaries of Interviews Describing Allen's $7,993 Payment to Kott Do Not Undermine Confidence in the Jury's Verdict**

One of Allen's corrupt payments to Kott was in fact a device to funnel money to Kott's son, so that he could take time off from work to help with his father's reelection campaign. Kott owned a wood flooring business, and, at the time of the corrupt payment, had just recently refinished the wood floors in Allen's home. Allen and Smith testified at trial that they agreed with Kott to inflate (by an additional $7,993) the $12,000 flooring invoice Kott had given to Allen in order to funnel money to Kott's son.

Kott relies on three statements from the 302 of a September 27, 2006, interview with Bill Allen, which the government had not provided to him prior to trial, to argue that the government committed a *Brady* violation:

- "Kott did not want to give [Allen] an invoice, but [Allen] told Kott, 'bullshit, you worked hard.'" Allen Sept. 27, 2006, 302, p. 2 (Bates No. 47).

- "When [Allen] was building his[] house, Kott put in the floors. [Allen] estimates this cost around $24,000 to $25,000." *Id.* at 1 (Bates No. 46).

- "[Allen] stated that he[] thinks he[] paid approximately $17,000 for the aforementioned refinishing work. The initial invoice was for $12,000. [Allen] advised that Kott told [Allen] it was just $12,000, but [Allen] said that Kott did more than that, so the rest was a bonus." *Id.* at 2 (Bates No. 47).

Kott argues that this information is favorable because it suggests that he was entitled to the

$7,993 based on the work he performed at Allen's house as a "bonus" for the high quality of the work. Kott never mentions, however, the tapes or his admissions in his analysis, and he never explains how his possession of this information would have changed the jury's verdict. As explained below, there are four independent reasons why each of these statements, taken individually or collectively, are either not favorable to Kott or not material to his guilt or punishment.

### i. Kott Has Taken Two of the Three Statements Out of Context

First, Kott takes two of the three statements out of context and then ascribes to them meaning that they do not have. The first statement Kott relies on ("Kott did not want to give [Allen] an invoice, but [Allen] told Kott, 'bullshit, you worked hard'") is actually contained in the following paragraph:

> [Allen] remembers a conversation about how he[] was going to compensate Pete Kott Jr. on the campaign. [Allen] thought Rick Smith was going to take care of it and get work (flooring work) done in his house. [Allen] advised that he[] does not recall seeing a check. Kott did not want to give [Allen] an invoice, but [Allen] told Kott, "bullshit, you worked hard."

Allen Sept. 27, 2006, 302, p. 2 (Bates No. 47). In the very next paragraph, the 302 goes on to clarify: "[Allen] stated he[] knew the invoice was going to be inflated to compensate Kott." *Id.* Therefore, this statement, which Kott asserts to be exculpatory, is actually inculpatory, corroborates Allen's and Smith's testimony, and supports the government's charge that the inflated flooring invoice was part of an illegal scheme to funnel money to Kott. *See, e.g.*, Kott Tr. Vol. 6B, p. 69 (Sept. 12, 2007) (discussing a "foolproof" plan to get "some money where [Kott] could pay his son, because his son was going to help him on his reelection"). Thus, this sentence from the Allen 302, in its correct context, is not favorable to Kott, much less a material statement whose suppression

warrants dismissal.

The next sentence Kott relies on ("When [Allen] was building his[] house, Kott put in the floors. [Allen] estimates this cost around $24,000 to $25,000") has nothing to do with the 2006 refinishing job, the invoices for that job, or its cost; rather, it is referring to work that Kott performed years earlier in 2001, "when Allen was building his house":

> Kott lost flooring equipment, such as floor sanders, in a warehouse fire that took place sometime between 1998 and 2000. As a result, source purchased Kott new equipment, including sanders, vacuums, belt sanders and saws. The equipment was purchased through Rex McKay and Derrick Awad. Source estimates the equipment cost between approximately $10,000 to $12,000. When [Allen] was building his[] house, Kott put in the floors. [Allen] estimates this cost around $24,000 to $25,000.

Allen Sept. 27, 2006, 302, p. 1 (Bates No. 46). To be clear, the inflated $7,993 payment charged in the indictment involved refinishing work that took place in July of 2006. The flooring work Allen described in the statement on which Kott now relies is from 1998-2001. In fact, the statement is consistent with Allen's testimony:

> Q:        And your home—had you had your home remodeled in 2001?
>
> Allen:            Yes.
>
> Q:        And who put in the floors in your house?
>
> Allen:        Pete did.

Kott Tr. Vol. 6B, p. 70 (Sept. 12, 2007). The statement on which Kott relies could not be clearer on this point: Allen refers to "Kott putt[ing] in the floors" at a time "[w]hen Allen was building his[] house . . . ." Allen Sept. 27, 2006, 302, p. 1 (Bates No. 46). The work underlying the false invoice charged in the indictment, however, was refinishing work on floors that were already in place, and was performed years after Allen's house was built.

The third statement could be viewed as favorable to Kott, and arguably could have been used

to cross-examine Allen. However, for the reasons discussed below, the statement was not material. Among other things, all three statements on which Kott relies are taken from the same 302 summarizing an interview in which Allen clearly and unequivocally described the corrupt scheme to divert money to Kott's son for the purpose of funding his campaign work. Indeed, another section of this 302, again omitted by Kott, says: "[Allen] stated he[] knew the invoice was going to be inflated to compensate Kott. [Allen] stated he[] never figured out how they did it." *Id.* at 2 (Bates No. 47).[6]

Finally, statements in other 302s further corroborate Smith's and Allen's testimony, and eliminates the notion that there is anything exculpatory, or materially inconsistent, about Allen's initial comments about the invoice scheme. Many of these statements, some of which we highlight for the Court below, come from an interview *of Kott himself*, which the government disclosed to him. They are his own description of the invoice scheme, although he tried to blur its corrupt nature by claiming it was "advance payment" for work that would be performed in the future. But more importantly, the government introduced many of these statements in its case-in-chief.

- "Kott advised Allen that the best person to run his campaign was his son, but if his son ran the campaign then he would lose $7,000 in flooring wages. Kott told Allen that his son represents him well, and it would be difficult for Kott to run a winning campaign by himself." Kott Aug. 31, 2006, 302, p. 4 (Bates No. 4538).

- "Allen suggested that Kott prepare a new invoice for the refinishing job. . . . . The purpose of this second invoice was to provide money to pay Kott's son for the wages that he would lose while working on his father's campaign. The second invoice was for $19,993." *Id.*

- "Kott's son received $7,000 of the funds from the second invoice." *Id.*

_____

[6] In context, "they" refers to Smith and Kott, to whom Allen left the task of working out the details of how they would accomplish the payoff.

- "VECO could not write Kott a check directly for his campaign, due to a $1,000 maximum campaign limit. Kott admitted that the $7,000 payment from Allen to pay his son for services as campaign manager was an unreported campaign contribution." *Id.* at 5 (Bates No. 4539).

- "To compensate Peter Kott [Jr.] for the time he was working on the campaign, Allen and Smith agreed to reimburse Kott for the lost wages through the hardwood flooring business. Allen acknowledged giving Kott cash in the Suite 604 of the Baranof Hotel during the last legislative session. The cash was not a reimbursement [for] Kott." Allen Aug. 30, 2006, 302, p. 2 (Bates No. 2).

- "Bill Allen wanted to compensate Pete Kott Jr. For his work on Pete Kott's political campaign. Pete Kott issued a second invoice for Bill Allen's floor job that was approximately $19,900. Bill Allen issued two checks to Pete Kott which he believed totaled the amount billed on the second invoice." Allen Dec. 11, 2006, MOI, p. 8, ¶ 38 (Bates No. 59).

### ii. Kott Ignores the Chronology of the Payment

Next, Kott's reliance on the first statement ignores the chronology of the payment. That statement ("Kott did not want to give [Allen] an invoice, but [Allen] told Kott, 'bullshit, you worked hard'") in fact corroborates Allen's and Smith's testimony. Allen and Smith testified that Kott, Allen, and Smith devised a scheme to inflate the flooring invoice by almost $8,000 *after* Kott had already submitted the first invoice for $12,000. One can only interpret the statement on which Kott relies as a reference to the first invoice because that is the only time when Kott had not yet given Allen an invoice. The fact that Kott may have legitimately earned the $12,000 in the first invoice is in no way relevant to whether he legitimately earned the $7,993. In fact, the government does not dispute that Kott legitimately earned the $12,000 submitted in that first invoice. The government's evidence at trial, including the recordings, established that Kott, Allen, and Smith devised this criminal scheme after Kott submitted the first invoice.

### iii. The Audio and Video Tapes Are Alone Sufficient to Preclude a Finding of Materiality

Even viewing the statements in a light most favorable to Kott, they are not material because the video and audio recordings at trial captured this scheme as it unfolded in real time. On July 31, 2006, after Kott informed Allen and Smith that he needed money for his son to work full-time on his re-election campaign, Allen and Smith discussed getting the money to Kott:

Allen:          [Kott] needs more money, I think.

Smith:          Uh, I'll talk to Pete about it, okay? He's supposed to get with me in the next, oh, couple of hours . . . .

Allen:          Well, we've got to figure out a way to get, uh, his son some money, and I don't know exactly how to do that.

Smith:          Well, I'll talk to Pete about it.

Allen:          Okay.

Kott Tr. Vol. 6B, p. 69 (Sept. 12, 2007).

Following that conversation, Kott, Allen, and Smith discussed what Allen described as a "foolproof" plan to get Kott the additional money. *Id.* This conversation took place on July 31, 2006, the same day as the conversation between Allen and Smith. Kott had just refinished Allen's floors, and had already billed Allen $12,000 for the job. At Smith's suggestion, Kott sent a fraudulent additional bill for just under $8,000.

Later, in an August 2, 2006, recorded phone conversation, Smith told Kott that he had a check for Kott. The same day, in accordance with their "foolproof" plan, Smith directed a VECO employee to pay a fraudulently inflated invoice of $7,993 that Kott's Hardwood Flooring sent to VECO. A check dated July 31, 2006, and drawn from Allen's personal bank account, was later deposited into a bank account related to Kott's Hardwood Flooring. Kott later acknowledged to

Allen in a recorded conversation that he received the money. Allen and Smith both testified that the $7,993 was intended to be a financial benefit to Kott, which is consistent with, and corroborated by, the tapes that captured their conduct as it unfolded. All of these conversations were captured on tape, and these recordings, the invoice, and the check, were all introduced as evidence in Kott's trial. Thus, the tapes alone are more than sufficient to show that the statements on which Kott relies were not material.

### iv. Kott's Own Testimony is Sufficient to Preclude a Finding of Materiality

Finally, Kott's own testimony on this issue established that the $7,993 payment was not for work actually performed. Specifically, Kott admitted at trial that he was not entitled to the $7,993 based on any work that he had actually performed, conceded that he gave $7,000 of these funds to his son, but claimed that this payment simply obligated his son to perform work at some unspecified point in the future. Kott Tr. Vol. 12, pp. 115, 172-76 (Sept. 20, 2007). Kott also admitted that this money allowed his son to work on his campaign. *Id.* Moreover, Kott made many of these same admissions when he was approached on August 31, 2006, during a search of his office, and these admissions were introduced as evidence in the government's case-in-chief. Kott Tr. Vol. 9 (Sept. 17, 2007).

In sum, Kott's argument, which is based on an interview summary of Allen describing the flooring invoice scam, takes information out of context and is inconsistent with the chronology of the undisputed events. But more importantly, Kott's interpretation of the information from this 302, that the extra payment was a legitimate bonus for the high quality of his refinishing work on Smith's floors, is not only contradicted by the tapes that captured his scheme as it actually unfolded, but by Kott's own admissions at trial and to the FBI. Thus, the allegedly suppressed information provides

no basis for dismissal.

> **2.** **The Fact that Allen's $1,000 Cash Payment to Kott May Have Been Intended as an Illegal Reimbursement for a Campaign Contribution Is Neither Exculpatory Nor Undermines Confidence in the Jury's Verdict**

Kott argues very briefly that the government's appellate brief and the government's closing argument are inconsistent with handwritten notes from an interview with Allen on September 27, 2006. Mot. at 18. Kott relies on these notes to argue that there was nothing corrupt about the $1,000 cash payment that Allen furtively delivered to Kott in the privacy of a hotel room. These notes state: "2006: gave him $1000 cash. Didn't tell PK why he was giving him the $. Didn't say it was to reimburse PK for the Murkowski campaign contribution. Only knew PK made the contribution through Rick." Kott also relies on agent notes from an Allen interview, which he inaccurately claims state: "1000 for Murkowski — BA never told PK what it was for, or to make the contrib." *Id.* at 18-19. Prudence suggests that this information should have been disclosed prior to trial. But when viewed in this post-trial context, Kott does not establish that the information was material. In his analysis, Kott again omits any reference to the tapes or to his own admissions. Kott also fails to explain how this information undermines confidence in the jury's verdict.

There are five independent reasons why the information that Allen may have intended to reimburse Kott for a campaign contribution with a $1,000 cash handout is immaterial to Kott's guilt or punishment. First, the government's appellate brief and its closing argument, whatever relevance they have to a post-trial materiality analysis, are not inconsistent with the information identified by Kott.

Second, Kott misconstrues the information contained in the agent notes. In his motion, Kott uses quotation marks to make it seem like the agent notes read, "1000 for Murkowski — BA never

told PK what it was for, or to make the contrib." What Kott presents as verbatim language of the agent notes, however, is in fact an inaccurate characterization of the notes, which omits several important pieces of information. The agent notes in fact read: "The only time [Allen] gave [Kott] cash was the $1000 when he went to Murkowski fundraiser. In BA's mind it was a reimbursement for the campaign contribution, but BA didn't tell him what it was for. BA didn't tell him to make the contribution. Rick asked him to." Agent Notes (Bates No. 42). Kott attempts to use this information to claim that he made the Murkowski contribution on his own, without Allen or Smith asking him to do so. He selectively cites the portion of the agent notes that say Allen never told Kott to make the Murkowski contribution, but he fails to include the next sentence describing how Smith asked him to make the contribution. Thus, Kott takes out of context some of the key information on which he relies to make his argument.

Third, Kott already possessed the information in the note before trial. At trial, the defense elicited testimony from Allen on cross-examination that Kott had made a $1,000 contribution to the Murkowski campaign a few days prior to this payment, and suggested that Kott had made the donation at Allen's suggestion and Allen was repaying him. Allen agreed with that characterization, and said, "[Kott] didn't ask it. I just give it to him." Kott Tr. Vol. 7, p. 22 (Sept. 13, 2007). This cross-examination makes clear that Kott knew the information in the notes prior to trial, which makes sense, given that he was a participant in the exchange. Failure to produce information already known to the defense cannot result in a *Brady* violation. *See, e.g.*, *United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009) ("[W]here exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine. Additionally, there is no *Brady* violation if the defense is aware

of the evidence in time to reasonably and effectively use it at trial.") (citations and quotation marks omitted); *Lamarca v. Secretary, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir. 2009) (holding that to establish a *Brady* violation, a defendant "must establish . . . [that] the defendant did not possess the evidence and could not have obtained it with reasonable diligence"); *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987) ("[N]o *Brady* violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence."). Accordingly, to the extent Kott argues that the information was favorable, it was known to him, he used it to cross-examine Allen, and Allen agreed with the substance of the claim.

Fourth, while the information in the notes is arguably favorable to Kott, the tapes preclude finding that the information was material. As noted above, on June 1, 2006, a video and audio tape, which was introduced at trial, captured Allen handing Kott $1,000 in cash, and it is uncontested that Kott made a $1,000 contribution to Murkowski's gubernatorial campaign immediately prior to this payment.

Finally, Kott testified at trial and admitted that "[Allen] asked me to make a campaign contribution to the Murkowski campaign," said "he would pay me back," and then "[Allen] approached me and said here's what I owe you." Kott Tr. Vol. 11, p. 118 (Sept. 19, 2007). In light of these admissions, the failure to produce these notes did not affect the outcome of the prosecution. The failure to produce these notes therefore did not result in a *Brady* violation warranting overturning the jury's verdict in this case, and the defendant's motion should be denied.

### 3. Information that VECO Purchased Polls for Other Politicians Does Not Undermine Confidence in the Jury's Verdict

Kott argues that an interview report of a pollster, who did not testify at trial, undermines Smith's trial testimony that VECO paid for a poll for Kott's re-election campaign. Mot. at 19. Specifically, Kott relies on a 302 from a September 1, 2006, interview with Marc Hellenthal, who runs a polling company, stating that there were numerous times when VECO purchased polls for its own information and permitted candidates to "piggyback" onto the polls for a lesser sum. Kott also relies on a 302 from a September 12, 2006, interview in which Smith says that he "routinely purchased polls for candidates running for political office or polls on political issues for which [Smith's] company had an interest." Relying on these statements, Kott argues that the Smith 302: "memorializes Rick Smith's statement that this might be the poll 'where the pollster was not paid.' If VECO, Smith and Allen did not even pay the pollster, then they certainly did not bribe Kott with such nonpayment." Mot. at 21.

Kott again fails to explain how this information creates a reasonable probability that had the information been disclosed, the jury's verdict would have been different. First, it is undisputed that Smith and VECO paid for Kott's poll. Therefore, although the notes could have been used to cross-examine Smith, that cross-examination would not have caused the jury to disbelieve or disregard the strong evidence to the contrary, including Smith's own recorded conversations with Kott, the polling company, or Kott's campaign manager that he did in fact pay for Kott's poll. The $2,750 invoice the polling company sent to VECO, and the check VECO sent to the polling company for that amount, also clearly establish that Smith paid for Kott's poll.

Second, Kott has not identified any inconsistency between Smith's testimony at trial and any information in the 302s. The fact that VECO purchased polls for other candidates does not

undermine the allegation that it also purchased a poll for Kott; in fact, it makes it more likely that VECO paid for Kott's poll. The fact that VECO may have commissioned various polls for its own corporate purposes, rather than for corrupt purposes, also does not undercut Smith's testimony and would not have been admitted in any event. There is no information to suggest that Kott or Kott's campaign "piggybacked" onto the poll at a reduced rate, or independently paid for the poll. In fact, the tapes and the documentary evidence, which remain undisputed, establish just the opposite. The fact that VECO commissioned numerous polls is not a favorable fact for Kott, and any failure to disclose that information was not a *Brady* or *Giglio* violation.

In any event, the tapes clearly demonstrate what happened here. On July 12, 2006, in a recorded telephone conversation, Kott and Smith discussed whether Jerry Mackie, Kott's campaign coordinator, had told Kott that VECO hired Dittman Research to conduct a poll for Kott:

> Smith:      Mackie told you about the Dittman poll, right?
>
> Kott:        Yeah.
>
> Smith:      I talked to Dittman today, it's all square and if you need to do something you know later we're in on that too. So, I told those two guys, Mackie and Dittman, to get a hold of you if you need to do something, talk about it and we'll take care of that too. Okay?
>
> Kott:        Alright.

Smith testified about this conversation, and confirmed that "[Kott] knew that we had taken care of the poll, he was going to—he was going to get the poll and use it in his campaign, and that we'd paid for it." Kott Tr. Vol 8, pp. 94-99 (Sept. 14, 2007).

Following that conversation, and on the same day, Smith spoke with Dittman Research, and arranged for them to conduct a poll for Kott's re-election campaign. Smith clarified, however, that Dittman Research should bill VECO for the cost of the poll. Immediately thereafter, Dittman

Research prepared an invoice for a poll for Kott's re-election campaign, and addressed the invoice to Smith at VECO. As soon as Smith received the invoice, he wrote a check from VECO for $2,750, covering the entire cost of the poll. On July 30, 2006, Smith told Kott that he would get the results of the poll later that day, and confirmed that VECO, not Kott or Kott's campaign, paid for the poll's cost.

Finally, Kott admitted at trial that he "learned during [his campaign] that Rick Smith had ordered a poll . . . on [his] campaign . . . ." Kott Tr. Vol. 12, p. 82 (Sept. 20, 2007). He further admitted that he read and discussed the results of the poll prior to his election. *Id.* at 165.

Therefore, the information in the 302 on which Kott now relies to claim that there was nothing corrupt about the poll is contradicted by the tapes and by his own admissions at trial. Thus, the information identified by Kott is not material to any issue at trial.

### 4. Information About Allen's Promise to Help Secure Post-Legislative Employment for Kott Does Not Undermine Confidence in the Jury's Verdict

Kott argues that Allen's statements from an interview on September 27, 2006, which were not produced to Kott prior to trial, undermine Allen's testimony that he promised Kott post-legislative employment opportunities if he delivered on the pipeline legislation. Mot. at 21. Specifically, Kott points to two statements in the 302 to suggest that Allen did not promise a "job" to Kott. First, Kott points to the following from this 302: "[Allen] stated Kott would have worked on the PPT . . . if [Allen] did not pay him any money." Allen Sept. 27, 2006, 302, p. 4 (Bates No. 49). Second, Kott relies on this sentence: "Kott told [Allen] the best thing to be would be a lobbyist and [Allen] told Kott that he[] would help him." *Id.*

This information could arguably have been used to cross-examine Allen at trial, but at the end, would not have had an effect on the outcome of the case. Specifically, Kott omits from his

25

analysis any reference to the tapes the government played at trial, which set out the parties' numerous detailed discussions about how Allen and Smith agreed to help Kott once he secured the pipeline. These tapes also lay out with specificity the many official acts Kott took on behalf of VECO in order to secure the pipeline. And, again, Kott omits any materiality analysis from his argument.

There are several reasons why this information does not raise a reasonable probability that, had the information been disclosed, the jury's verdict would have been different. The government never disputed that Kott would have worked on the PPT without Allen's bribes. Information that Kott would have worked generally on the PPT even if Allen had not paid him any money is consistent with the government's evidence, and Kott's own recorded admission, that Kott supported the legislation but would not have supported the 20% tax rate but for Allen. The PPT had many legislative incarnations, but only one that Allen supported. As captured on video and audio recordings, Kott proudly confessed that if it were not for Allen he would still be working on the PPT, *but* he would instead be supporting a much higher 30% tax rate. Kott Tr. Vol. 12, p. 110 (Sept. 20, 2007). Even if Kott would have "worked on" the PPT without Allen's bribes, it is beyond dispute that he followed Allen's instructions about which version to support and how to go about securing that version of the PPT. Therefore, Allen's speculation about what Kott would have done in another situation is of no consequence when viewed in light of Kott's candid admission about what he did and his motivation for doing so.

Moreover, it makes no difference whether Kott would have worked on the PPT without the promise of a job or the money that Allen paid him. It is not a defense to bribery to claim that Kott would have worked on the PPT absent Allen's bribes. *See, e.g., City of Columbia v. Omni Outdoor*

*Advertising, Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid. That is frequently the defense asserted to a criminal bribery charge—and though it is never valid in law, it is often plausible in fact.") (internal citations omitted). Bribery is criminal not only because it has the potential to corrupt particular official acts, but because it inherently corrupts the process.

Next, the interview summaries Kott identifies concerning his job prospects after leaving politics are not inconsistent with Allen's testimony. Regarding post-legislative employment for Kott, Allen testified: "I didn't know exactly where to put him at that time." Kott Tr. Vol. 6, p. 48 (Sept. 12, 2007). The promise, though, was that "[i]f he needed a job, I'd get him a job." *Id.* at 49 (Sept. 12, 2007). Kott fails to explain how this testimony is inconsistent with a 302 reflecting Allen's statement that he had agreed to "help" Kott become a lobbyist if that is what Kott decided to pursue. In fact, like much of the other information Kott identifies, this information is not inconsistent with Allen's testimony and the evidence introduced at trial. In any event, whether Allen agreed to "help" Kott secure post-legislative employment or firmly promised to help Kott secure post-legislative employment cannot reasonably undermine the jury's verdict, particularly in light of the strength of the additional evidence supporting the charges and corroborating Allen's testimony.

Finally, this information could not have been material because the most Kott would have been able to do with it is ask Allen on cross-examination whether he believed Kott would have voted differently. Compared with the substantial direct evidence of Kott's state of mind, Allen's speculative response about Kott's state of mind would have been unremarkable.

5.    **Information About Allen's $5,000 Down Payment for Kott's Truck Does Not Undermine Confidence in the Jury's Verdict**

Kott claims that "at trial, the government elicited testimony that Bill Allen's $5,000 down

payment on a truck for Pete Kott amounted to bribery, extortion, an exchange of a 'gift' of value for Kott's support." Mot. at 22. Kott does not explain, however, that the government elicited this testimony only when cross-examining Kott himself. Kott Tr. Vol. 12, p. 156-60 (Sept. 20, 2007). Kott then curiously asserts that "the government elicited testimony from Bill Allen on the witness stand [about the $5,000 truck payment] and argued that contrary testimony in closing." Mot. at 24. Kott offers no citation to the trial transcript, which is not surprising given that the government never elicited testimony from Allen regarding the $5,000 down payment for the truck.

Kott then juxtaposes *his own trial testimony* with the following sentences from rough handwritten notes and an FBI 302: (1) "Pete never reimbursed BA for the 5K. Considered loan, but didn't push him for it," and (2) "Roger . . . told BA that he couldn't give him the truck, BA would probably have given the truck if Roger didn't say anything. Pete was proud, is good friend, having [sic] for 15 years." Mot. at 4, 23-24. Kott argues that the government violated *Brady* by failing to turn over this information.

This analysis completely misconstrues the record. The $5,000 payment was not charged in Kott's indictment, and neither Allen nor any other government witness testified about the $5,000 payment. The only time the jury heard about this $5,000 payment was when, by testifying that Allen never gave him any other money, Kott opened the door to cross-examination on the issue:

> Mr. Goeke:     Mr. Kott's testimony has opened the door to several of the issues related to other benefits he received from Mr. Allen. Mr. Wendt specifically asked Mr. Kott if he'd received any other cash from Mr. Allen ever, and he said no. That will leave the jury with a false impression. Mr. Kott has received a five-thousand-dollar—
>
> The Court:     On that point, I agree.

Kott Tr. Vol. 12, p. 94 (Sept. 20, 2007); *see also id.* at 95 ("[The government] intend[s] to present

evidence that [Kott] received five thousand dollars, which is directly contrary to what Mr. Kott said."). On cross, the government questioned Kott about the money for a truck down payment. When Kott explained it was a loan, the government elicited Kott's admission that the loan was not memorialized, had no terms of any kind, including interest, had no repayment scheduled, and Kott had never actually made any repayments. *Id.* at 156-60.

Allen's purported description of the $5,000 payment as a loan is not exculpatory and does not contradict the testimony of any government witness. Thus, it does not undermine confidence in the jury's verdict.

**6.      Kott's Arguments About His Motivations for Taking Official Acts Do Not Undermine Confidence in the Jury's Verdict**

A common theme underlying Kott's motion is his argument that the documents from the government's investigative files suggest there was no corrupt relationship between Kott and Allen, and that the $7,993 check from Allen, the $1,000 cash payment furtively delivered in a hotel room, the $2,750 political poll, and the promise of a new job were not intended to influence Kott's official acts. Kott's underlying theme is that their friendship motivated Allen to provide Kott with the items of value that form the basis of Kott's charges.

Kott relies on several portions of 302s of interviews with Allen to demonstrate the close friendship between Kott and Allen. More specifically, Kott relies on the following: "[Allen] has known Kott for 15 years and Kott is a proud, good friend." Allen Sept. 27, 2006, 302, p. 5 (Bates No. 50). Kott also relies on the following from a September 13, 2006, 302 from an interview with Smith: "[Smith] advised that Allen was the kind of person who gave money to people who were in need, such as Pete Kott and Beverly Masek." Smith Sept. 13, 2006, 302, p. 1 (Bates No. 103).

The information about Kott and Allen's friendship *was* disclosed pretrial and, in the

alternative, even if it was not this information does not undermine confidence in the jury's verdict.

First, although 302s were not produced, the government's *Brady* letter disclosed Allen's mixed motives for providing money to Kott: friendship and to influence Kott's official acts on the PPT legislation. *See* Brady Letter (Bates No. 4699) ("Potential government witnesses Bill J. Allen and Richard L. Smith, if they testify at trial, would testify that with regard to many of the benefits they and VECO provided to Peter Kott . . . [they] provided such benefits partly so that Kott would continue to take official actions on the part of VECO and Allen and partly because Allen and Smith considered Kott a friend."). Thus, although information in the 302s could arguably have been used to cross-examine Allen, ultimately the defense received the information about the friendship through government's *Brady* letter, making it unlikely that the 302s themselves would have altered the outcome of the trial.

Moreover, the government exhaustively elicited information about the scope and depth of Allen's close friendship with Kott during Allen's direct examination. *See, e.g.*, Kott Tr., Vol. 6B, pp. 23-24, 42-44, 46, 50 (Sept. 12, 2007). Indeed, the government specifically elicited this testimony to make it clear friendship was a partial motive for providing the things of value to Kott. *Id.*

Finally, the recorded conversations between Allen and Kott clearly establish the corrupt nexus between Kott's successful stewardship of the PPT legislation and the things of value, such as future employment. In a recorded conversation on May 7, 2006, Kott admitted to Allen and Smith that if it were not for Allen, Kott would be supporting a much higher 30% tax for the PPT. Kott Tr. Vol. 12, p. 110 (Sept. 20, 2007). This conversation occurred after Kott had defeated an amendment to the PPT that Allen disliked, and Kott described to Allen and Smith how he had lied to a colleague

in the legislature in order to kill the amendment.  During this conversation, Kott said, "I hate to [expletive] [State Representative] Ethan [Berkowitz], but hey, I got Allen [pointing to one side of him], I got Ethan [pointing to the other side of him] . . . I use 'em and abuse 'em." *Id.* at 111-13.  Kott continued, "I had to get 'er done.  So, I had to come back and face this man right here [pointing to Allen].  I had to cheat, steal, beg, borrow, and lie." *Id.* at 7-8.  Later in the same conversation, Kott twice stated that he had "sold [his] soul to the devil." *Id.* at 111-13.  Allen simply responded, "I own your ass." *Id.*  The banter is both friendly and openly corrupt.

Thus, the information Kott relies on here was cumulative of other information that the government disclosed pretrial, has marginal evidentiary value, and is belied by Kott's corrupt admissions captured on tape.  Thus, this information does not ultimately undermine confidence in the jury's verdict.

### 7. Kott's Attempt to Impeach Allen's Credibility Relies on Inadmissible Allegations and Therefore Does Not Undermine the Jury's Verdict

#### i. Allegations of Allen's Past Criminal Conduct Have No Evidentiary Value and Do Not Undermine the Jury's Verdict

Kott spends the bulk of his motion detailing allegations of Allen's prior sexual misconduct.  Specifically, Kott devotes pages of his motion to prurient, irrelevant details contained in hearsay accounts about Allen.  *See, e.g.*, Mot. at 33.  However, in the thirteen pages Kott devotes to allegations about Allen unrelated to public corruption, Kott never cites to any federal rule of evidence, case law, or other legal authority.  The reason is clear: the law rightly requires courts to exclude such irrelevant, collateral impeachment material.

In the abstract, allegations about Allen's criminal conduct could only be relevant for two reasons:  to impeach his character for truthfulness or to impeach him for bias.  Neither applies here.

Rule 608 of the Federal Rules of Evidence governs the admissibility of character evidence:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness concerning the witness' character for truthfulness or untruthfulness . . . .

Fed. R. Evid. 608(b). Allegations of sexual misconduct are not probative of a witness' character for truthfulness. Moreover, even if deemed relevant to credibility, under Fed. R. Evid. 403, the probative value of such an inquiry is substantially outweighed by the prejudice of such questions in front of the jury. Therefore, Kott would have been precluded from using this information to impeach Allen's credibility.

Kott obliquely suggests that he could have impeached Allen for bias with these allegations. Mot. at 32-39. In particular, he quotes the following statement from Anchorage Police Department Detective Vandergriff: "In March 2004 I was advised by AUSA Frank Russo to not actively investigate this case as it might interfere with a federal investigation involving Allen and Josef Boehm." Mot. at 35. An argument that Allen could have been impeached with this information should be quickly dismissed. As an initial matter, the government disputes that any prosecutor directed anyone to forego investigating Allen.[7] More importantly, at the time Allen was not a subject of the Polar Pen corruption investigation. In addition, he was not approached or arrested by federal authorities until August of 2006, and he did not cooperate until that time.

Moreover, even were one to assume that this allegation was accurate,[8] Kott presents no

---

[7] *See, e.g.*, "Allen Teen Sex Inquiry Reopened," Anchorage Daily News (June 2, 2008).

[8] To be clear, we strenuously deny this allegation.

information that Allen knew federal authorities had told the APD to hold off on their investigation more than two years before he was arrested.  Allen could not have been biased by information that he did not know, and, therefore, Allen could not have been impeached for bias with these allegations.

Secondly, the tenor and tone of Kott's motion imply that the information about his sexual misconduct could have been used to embarrass and humiliate Allen.  Rule 611, however, expressly precludes such use: "The Court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . *protect witnesses from harassment or undue embarrassment*."  Fed. R. Evid. 611(a)(3) (emphasis added).  Indeed, "there is a duty to protect [the witness] from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him."  *Alford v. United States*, 282 U.S. 687, 694 (1931).

Moreover, Rules 401 and 403 of the Federal Rules of Evidence would have precluded offering any evidence on, or even inquiring into, such allegations.  Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Rule 402 of the Federal Rules of Evidence says, "[e]vidence which is not relevant is not admissible."  Fed. R. Evid. 402.  These allegations have no relevance to the charges against Kott or to Allen's character for truthfulness and are therefore inadmissible.

But even if a court deemed the allegations relevant, Rule 403 would have precluded offering any evidence on, or even inquiring into, the allegations.  Rule 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. These allegations are highly charged and would certainly confuse the issues and mislead the jury. These allegations have no probative value whatsoever, but even assuming that they were somehow probative of Allen's credibility, any minimal probative value would be substantially outweighed by the distraction they would cause.

At trial, Allen already acknowledged that he was the center of a corruption scheme involving Alaskan and U.S. legislators, that he had violated laws of the United States, and that he had done so for years. Coupled with clearly criminal conversations with Kott that were captured on tape and played for the jury, it is difficult to believe that a single question about Allen's alleged sexual misconduct, even if allowed by this Court, would alter the jury's verdict. Kott certainly has not stated otherwise.

Thus, because the information on which Kott relies here has no evidentiary value and would actually be excluded by the Rules of Evidence, the government did not have to disclose this information and, therefore, it does not undermine confidence in the jury's verdict.[9]

> ii.  **Allegations that Allen Asked Person A to Make a False Declaration Under Oath Does Not Undermine the Jury's Verdict**

Kott argues that he could have impeached Allen with information that years ago, a witness in another case under investigation [hereinafter, "Person A"] stated that Allen asked Person A to make a false declaration under oath. Prudence suggests this evidence should have been produced

---

[9] The government recognizes that in some cases, information that is itself not admissible should be disclosed if it would lead to admissible evidence. However, Kott has failed to make any showing that this would be the case with respect to any of this information.

prior to trial, but ultimately this information would not have changed the trial's outcome. Even if true, the allegation is a collateral impeachment issue, and the most Kott would have been able to do with it is cross-examine Allen about whether he ever asked anyone, including Person A, to make a false declaration under oath. When weighed against the mountain of incriminating evidence introduced at trial it is clear that this collateral information does not rise to the level of a reasonable probability that the jury's verdict would have been different if Kott had been permitted to ask that single question.

The government interviewed Person A on July 22, 2004, in an investigation unrelated to the Operation Polar Pen investigations. The 302 from this interview says the following:

> [Person A] had sex with Bill Allen when she was 15 years old. [Person A] previously signed a sworn affidavit claiming she did not have sex with Allen. [Person A] was given the affidavit by Allen's attorney, and she signed it at Allen's request. [Person A] provided false information on the affidavit because she cared for Allen and did not want him to get into trouble with the law.

[Person A] Jul. 22, 2004, 302, p. 1 (Bates No. 4666). This information may be favorable to Kott, since it may have allowed him to ask Allen whether he had ever asked another individual, including Person A, to make a false declaration. Kott's ability to impeach Allen with this information, however, would have been limited by the Rules of Evidence, in particular, Rule 608(b). The *most* Rule 608(b) would have permitted Kott to do with this information is question Allen on cross-examination in the most general terms whether he had ever asked another individual, including Person A, to make a false declaration under oath. Indeed, under Rule 403, this Court precluded defendant Josef Boehm from using this same information contained in the very same 302 to impeach Person A (who testified against him at trial), in a way that revealed the underlying facts because to do otherwise would have been prejudicial and distracting to the jury. *See United States v. Josef*

*Boehm*, 3:04-cr-00003-JWS.

Allen has been asked about Person A's allegation from July of 2004, and he has repeatedly denied ever asking Person A to sign a false declaration. *See, e.g.*, Allen Mar. 28, 2007, 302, p.1 (Bates No. 974); Allen Sept. 7, 2008, 302, p.1 (Bates No. 948). Therefore, once the question had been asked, Allen would have answered, "No," and that would have been the end of the inquiry. Rule 608(b) would have precluded the use of extrinsic evidence to establish whether Allen had in fact asked Person A to lie under oath. Moreover, subsequent to Person A's July 22, 2004, interview, she has denied that Allen ever solicited her false declaration, or that Allen asked her to lie under oath. *See, e.g.*, Person A Oct. 11, 2007, 302, p.1 (Bates No. 4668). More importantly, such a limited and marginal collateral inquiry could not have undermined confidence in the outcome of the proceedings, particularly where so much of the evidence was based on video and audio recordings.

Thus, although this information may be favorable to Kott, the limited evidentiary use of this information eliminates any reasonable probability that the result of the trial would have been different had the government disclosed this information to him before trial.

### iii. Kott's Reliance on the Argument of Defense Counsel from an Unrelated Case is Insufficient to Establish a *Brady* Violation

Next, Kott infers from a defense counsel's argument in an unrelated trial (which took place more than a year after Kott's trial) that there still must be undisclosed *Brady* information in this case. Specifically, Kott asserts that "[a]pparently, there was a government promise to give back millions of dollars [to Allen], characterized in Mr. Brendan Sullivan's post-trial argument in the Stevens case as a 'holdback' worth 'of his next tranche of millions of dollars.'" Mot. at 41.

Kott's argument is meritless. Kott presents no evidence or information supporting the defense counsel's arguments, and explains his argument and the nature of this alleged "holdback"

in such vague terms that it is difficult to understand his allegations.  Indeed, Kott cannot point to a single document or any other evidence that supports this allegation.  The government disclosed the fact that Allen sold VECO for more than $400 million dollars, and that Allen and his family retained an 85% equity interest in the company at the time it was sold.  The government is not aware of any other benefits that Allen received related to his financial interest in VECO.

Moreover, even assuming the veracity of this allegation, and assuming that Kott would be able to rely on something other than the post-trial arguments of defense counsel from an unrelated case, Kott fails to explain how this information would have affected the jury's verdict.  Indeed, it is highly unlikely that any evidence of an additional "holdback" would have affected anything, since, as noted above, the government already disclosed the hundreds of millions of dollars that Allen and his family received as a result of VECO's sale and Kott vigorously impeached Allen on this issue during cross-examination.  In this context, more information about the same subject would have made no difference.  In sum, Kott's speculations do not undermine confidence in the jury's verdict.

8.      **Kott's Attempt to Impeach Smith's Credibility Relies on Inadmissible Allegations and Therefore Does Not Undermine the Jury's Verdict**

Kott argues that he should have been able to impeach government witness Rick Smith with allegations that he had (1) a bad memory, (2) considered suicide, and (3) a drinking problem.  Some of the information upon which Kott relies, such as Smith's alleged bad memory, was created more than two years after Kott's trial, and thus could not have been disclosed to Kott before his trial.  The other information, including Smith's drinking, was already in Kott's possession and would not have been admitted at trial.

Regarding Smith's memory, Kott relies on an interview of Smith from June 22, 2009, in

which Smith says that his memory is "terrible." Kott argues that the fact of Smith's "terrible" memory should have been disclosed to him before his trial. The government is not aware, however, of any information that it possessed at the time of Kott's trial suggesting that Smith's memory was impaired in any way. Smith's own description of his memory in 2009 is obviously not information that the government could have disclosed to Kott prior to his trial more than two years beforehand.

Indeed, the only documents on which Kott now relies that the government possessed prior to his trial are several 302s from co-workers who suggested that Smith had a drinking problem. The facts, however, belie any suggestion that the government was trying to hide Smith's drinking problem. Kott had personal knowledge of Smith's drinking habits because he was one of Smith's drinking partners. The tapes, which the government provided to Kott before trial, reveal numerous instances of Allen, Smith, and others, including Kott, drinking heavily in Room 604 of the Baranof Hotel, where much of the corruption at issue in this case took place. Therefore, Kott already knew about Smith's drinking habits — likely in better detail than the government — and Kott could have cross-examined Smith on that point if he wished to do so.

Finally, even assuming the government knew before Kott's trial about allegations that Smith had considered suicide, Kott fails to articulate any evidentiary rule that would permit him to impeach a government witness with these allegations. Indeed, there is no such evidentiary basis, and, as noted below, Rules 401, 402, 403, and 611 would likely prohibit such impeachment on this issue.

All three of these allegations have limited evidentiary value and could not have been used to impeach Smith in the context of Kott's trial. Rules 401 and 402 would preclude any inquiry about alcohol use or suicidal thoughts because these allegations are unrelated to the charges and irrelevant to Smith's character for truthfulness. *See* Fed. R. Evid. 401 (defining "relevant evidence"), *and* Fed.

R. Evid. 402 ("Evidence which is not relevant is not admissible."). Even assuming these allegations

have any relevance to the charges or the issues at trial, however, any minor probative value would

be substantially outweighed by the prejudice and distraction it would cause to the jury, and the Court

would likely have excluded them under Rule 403. *See* Fed. R. Evid. 403 ("[R]elevant[] evidence

may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time,

or needless presentation of cumulative evidence."). These allegations have no probative value, but

even if they were probative of, for example, Smith's credibility,[10] any slight probative value would

be substantially outweighed by the unfair prejudice and confusion that would result from attempts

to impeach a witness with allegations of excessive alcohol use and considerations of suicide,

particularly in a trial about public corruption.

    Moreover, Rule 611 would have served as an additional, independent basis for excluding any

inquiry on these topics, particularly in light of the minimal probative value this information has to

the charges against Kott or to Smith's credibility. As previously explained, Rule 611 charges a court

with exercising "reasonable control over the mode and order of interrogating witnesses and

presenting evidence so as to . . . protect witnesses from harassment or undue embarrassment." Fed.

R. Evid. 611(a)(3). Questions about his alleged suicidal thoughts would undoubtedly have harassed

and humiliated Smith unnecessarily.

    In sum, Kott already possessed the information about Smith's drinking habits and he relies

on information that was created more than two years after his trial to argue that Smith was suicidal

---

[10] We note, however, that the issue at trial was not Smith's credibility. Smith's testimony consisted mainly of narrating the audio and video tapes that captured his and Kott's corrupt conduct.

and had a poor memory. Moreover, the allegations as a whole have limited evidentiary value. Thus, Kott fails to satisfy his burden of establishing that this information creates a reasonable probability that the jury would have returned a different verdict.

### 9. Neither Allen's Nor Smith's Testimony was Sculpted

Finally, Kott argues that the government sculpted Allen's and Smith's testimony to make it more incriminating. Specifically, Kott relies on some handwritten notes of a government attorney regarding Smith and Vic Kohring that say the following:

> [D]oesn't know what VK thought the cash payments represented. — whether he viewed them as bribes or gifts. Need to strengthen RS's response re: bribes v. gifts. RS says he doesn't know what VK though [sic] the payments represented. — then RS can't speculate as to what VK though [sic] the payments represented. — RS needs to bring it back to what RS/BA thought the payments represented.

Mot. at 29. Kott also relies on a September 10, 2007, e-mail that says the following:

> Allen is a horrible witness. No shock there, but he's been backsliding significantly on us over the past day or two. He has now taken to volunteering, even when not asked, things like 'Pete Kott was my friend' and 'he never extorted me.' We finally had a heart-to-heart with him tonight where we went through the tapes again and talked to him about his own statements, on the tapes, where he linked the VECO job to gaining Pete's official support. He seemed to get it by the end. I think he's in a good place right now, but the guy is like mercury on a plate glass window. We won't know what we'll get until he takes the stand."

Marsh Sept. 10, 2007, e-mail (Bates No. 4670). While the information contained in the notes and the e-mail may have been favorable, Kott's reliance on these documents to argue that the government sculpted Allen's and Smith's testimony at trial is misplaced.

Kott argues that the notes relating to Smith and Kohring "increase[] the probability that [Smith] allowed the government to tell him to characterize payments as bribes rather than gifts at Kott's trial." Mot. at 29. But information must do more than simply "increase probability" to establish a *Brady* violation; and information must "increase[] the probability" of something that

actually amounts to a *Brady* violation. These notes do not even mention Kott; they are discussing Smith's pending testimony in the Kohring trial. Furthermore, they fail to establish any sculpting of Smith's testimony, even related to Kohring's trial. In fact, they suggest just the opposite. These notes merely reflect the prosecutor's impression that Smith should be counseled not to speculate about Kohring's state of mind if Smith cannot testify with certainty about what Kohring thought the payments represented. The notes caution, "RS says he doesn't know what VK though [sic] the payments represented. — then RS can't speculate as to what VK though [sic] the payments represented. — RS needs to bring it back to what RS/BA thought the payments represented." Admonishing a witness not to speculate about another person's state of mind is appropriate trial preparation.

Kott's argument with respect to the e-mail exchange about Allen also would not have altered the outcome of the case. First, as noted above, the government had disclosed pretrial the information about Kott and Allen's friendship and Allen testified consistently on that issue at trial. Next, the e-mail itself does not suggest that Allen's testimony was sculpted. Indeed, the most important section of the e-mail is the following: "We finally had a heart-to-heart with [Allen] tonight where we went through the tapes again and talked to him about his own statements, on the tapes, where he linked the VECO job to gaining Pete's official support. He seemed to get it by the end." The government is permitted to show a witness evidence during the course of its trial preparation, particularly the witness' own statements, in order to refresh a recollection. That is exactly what the government did here.

Finally, Kott perhaps could have been able to use the notes and e-mail to (1) cross-examine Smith about whether Kohring — or by inference, Kott — thought the payments were bribes or gifts,

and (2) cross-examine Allen about whether he thought Kott was extorting him.  But a court likely would have sustained an objection to the first question based on speculation and an objection to the second question based on its call for a legal conclusion, and that would have been the end of the matter.  Therefore, though any inconsistent statements could have been used to cross-examine Allen, Kott fails to demonstrate how the jury's verdict would have been undermined, particularly in light of the overwhelming evidentiary strength of the video and audio tapes, the very same tapes the government used to prepare Allen for his testimony.

B.     **Non-Constitutional Sources of Authority Have No Bearing on a *Brady* Analysis**

Kott argues that "the government had an even broader ethical obligation to disclose each of the new documents identified above," and then points to various non-constitutional sources of authority.  Mot. at 53.  While the government certainly acknowledges that its attorneys have ethical obligations in addition to those imposed by the Constitution, those obligations have no bearing on this particular case in this specific posture, in which the questions are narrowly limited to "(1) whether the government breached its obligation of full disclosure under *Brady* and *Giglio*; (2) if so, whether the defendant was prejudiced by the violation; and (3) if the defendant was prejudiced, what the remedy should be."  *United States v. Peter Kott*, 9th Cir. No. 07-30496 (Dkt. No. 6951927) (citation omitted).[11]

––––––––––––––––––––

[11]   In any event, Kott has no standing to request relief based solely on the government's alleged ethical violations.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted.  The actual or threatened injury required by Art. III may exist *solely by virtue of statutes creating legal rights*, the invasion of which creates standing.") (internal citation and quotation marks omitted) (emphasis added).

**C.** **Because Kott Does Not Even Attempt to Engage a *Bagley* Materiality Analysis, He is Not Entitled to Any Relief**

**1.** **Kott is Not Entitled to Dismissal**

Kott requests that this Court "vacate and dismiss all convictions or, alternatively, order disclosure of additional *Brady* information and depositions . . . ." Mot. at 57. Dismissal, however, is not an appropriate remedy for a *Brady* violation except in the most extraordinary situations. Indeed, when a court finds that suppressed evidence favorable to an accused is material to either guilt or punishment, the preferred remedy is a new trial. *See Giglio*, 405 U.S. 150 ("*Brady* . . . held that suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution." (internal quotations omitted)). Under the Ninth Circuit's current law, dismissal is only proper if the *Brady* violation is willful, flagrant, and in bad faith. *See Chapman*, 524 F.3d at 1086 ("*Brady* violations are just like other constitutional violations. Although the appropriate remedy will usually be a new trial, a district court may dismiss the indictment when the prosecution's actions rise . . . to the level of flagrant prosecutorial misconduct."); *see also United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993) ("In determining the proper remedy, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it."). The Ninth Circuit has been unequivocal on this issue:

> The doctrine of separation of powers requires judicial respect for the independence of the prosecutor. Dismissing an indictment with prejudice encroaches on the prosecutor's charging authority, substituting a judicial wag-of-the-finger for the prosecutorial nod. Such an intrusion will be permitted only in cases of flagrant prosecutorial misconduct.

*United States v. Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991) (internal citations omitted).

"[A]ccidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior." *Chapman*, 524 F.3d at 1085 (citing *United States v. Kearns*, 5 F.3d 1251, 1255 (9th

43

Cir. 1993) (holding that dismissal was not warranted because even though the government's conduct "may have been negligent, or even grossly negligent," it did not rise to the level of flagrant misconduct)).

In *Simpson*, the Ninth Circuit reversed, for the second time, the district court's dismissal of an indictment because of the government's misconduct. The misconduct in *Simpson* included the FBI's use of an informant who worked as a prostitute, used and distributed large quantities of heroin, fled from Canadian law enforcement, and initiated a sexual relationship with the defendant, all while she was under the FBI's employment. In that case, the district court relied on the due process clause the first time the Ninth Circuit reversed the district court's dismissal. On remand, the district court dismissed again, this time under its supervisory power. The Ninth Circuit again reversed, and strongly emphasized the limits of the court's supervisory power:

> [Courts] do not . . . have a license to intrude into the authority, powers and functions of the coordinate branches. Judges are not legislators, free to make laws guided only by their moral compass or notions of national interest; nor are they executive officers, vested with discretion over law enforcement policy and decisions. Thus, while the supervisory power does empower judges to formulate procedural rules not specifically contemplated by Congress or the Constitution, it does not justify a chancellor's foot veto over activities of coequal branches of government.

*Simpson*, 927 F.2d at 1089 (citations and internal quotation marks omitted). The Ninth Circuit went on to caution that "[t]he Constitution empowers the judiciary to thwart the will of the other branches only when their behavior is not in accordance with law; we may not, by exercise of judicial fiat, impose our will upon the coordinate branches." *Id.* at 1091.

Kott has failed to establish materiality, so he is not entitled to any relief. Nonetheless, even if the Court were to find a material violation under *Brady* or *Giglio*, Kott's requested relief is not a new trial, but dismissal. The law is clear, however, and the Ninth Circuit is unequivocal on this

point — a *Brady* violation alone is not sufficient to warrant dismissal. Instead, the *Brady* violation must be willful, flagrant, and in bad faith. Kott nowhere acknowledges how this stringent standard for dismissal would apply here, and he fails to sufficiently allege, let alone meet his burden of showing, that anyone for the government acted with willfulness, flagrancy, or in bad faith. In one sentence, he baldly asserts that "[t]his is certainly a case of extreme prosecutorial misconduct in withholding material information and thereby undermining the fairness of the trial and prejudicing Mr. Kott. Not just reversal, but dismissal of the indictment, is therefore appropriate in this rare case." Mot. at 58. This sentence simply restates the dismissal standard in the form of an unsupported assertion.

As we have previously explained, Kott has not shown that any of the information upon which he now relies was material to his case. He has also failed to show that the government engaged in any willful or bad faith conduct. Kott requests extraordinary relief, but he has failed to present any evidence or information that would justify this Court taking that extreme step. This Court should therefore deny Kott's motion to dismiss.[12]

## VI.    CONCLUSION

The heart of the evidence against Kott consisted of hours of audio and video tapes that captured his corrupt conduct. The jury witnessed Kott accepting cash from Allen, and listened to

---

[12] As alternative relief, Kott requests that this Court "order disclosure of additional *Brady* information and depositions." Mot. at 57. Kott has not provided any authority for his requested alternative relief. The government has liberally opened its files to Kott and has exhaustively produced all information that is even arguably favorable, regardless of materiality, as well as numerous additional documents. This production was not required by *Brady*, *Giglio*, the *Jencks* Act, Rule 16 of the Federal Rules of Criminal Procedure, or any other authority. Kott's requested alternative relief is an effort to gather new, post-trial information and indefinitely prolong a process that is now complete. Thus, Kott's request for additional discovery and depositions as alternative relief should be denied.

Kott boast about the official acts he took and the legal and ethical boundaries he crossed for Allen's benefit and at Allen's instruction. Even though some of the information that the government recently disclosed could be considered favorable to the defendant, none of this information would have affected the jury's verdict when weighed against the compelling evidence introduced at trial, including Kott's own admissions. The undisclosed information therefore was not material to either guilt or punishment, and Kott could not have been prejudiced by any nondisclosure of the information upon which he now relies. In the end, therefore, the defendant has not established a constitutional discovery violation, much less one warranting dismissal. As this Court has already found, "[t]he evidence against Kott at trial was overwhelming," and the limited exculpatory nature of the information relied on by Kott does not raise "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Accordingly, this Court should deny Kott's motion to dismiss.

Respectfully submitted,


LANNY A. BREUER
Assistant Attorney General

KAREN LOEFFLER
United States Attorney


 /s/ James M. Trusty
JAMES M. TRUSTY
Deputy Chief, Gang Unit

 /s/ Kevin Feldis
KEVIN FELDIS
Chief, Criminal Division

KEVIN R. GINGRAS
Attorney, Appellate Section

United States Attorney's Office
District of Alaska

PETER M. KOSKI
Trial Attorney, Public Integrity Section
Criminal Division
United States Department of Justice


Dated: October 23, 2009

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this date, I caused a true and correct copy of the foregoing United States' Response Opposing Defendant Kott's Motion to Dismiss to be electronically filed and it is available for viewing and downloading from the ECF system.

  /s/ Peter M. Koski
Peter M. Koski
U.S. Department of Justice
1400 New York Ave, NW, Suite 12100
Washington, D.C. 20005

Dated: October 23, 2009