The Honorable John W. Sedwick

Sheryl Gordon McCloud
Law Offices of Sheryl Gordon McCloud
710 Cherry Street
Seattle, WA  98104
(206) 224-8777
Fax: (206) 623-5951
sheryl@sgmccloud.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:07-cr-00056 (JWS) |
| Plaintiff - Appellee, | REPLY RE MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR DISCOVERY |
| v. | NOTED FOR:  Tuesday, Nov. 17, 2009 |
| PETER KOTT, | TIME:          9:00 a.m. |
| Defendant - Appellant. | |

## I.     INTRODUCTION

The government acknowledges that every fact we placed in the Motion to Dismiss accurately reflected material from the newly disclosed, previously suppressed, evidence. It even concedes that "prudence suggests" that the critical documents should have been disclosed before Mr. Kott's trial because they were "favorable" to him.  Government's Response, pp. 11-12 (acknowledging "some of the undisclosed information may have been favorable to Kott"); *id*., p. 15 ("statement [regarding >$7,000 alleged overpayment for flooring] could be viewed as favorable to Kott, and arguably could have been used to

cross-examine Allen"); p. 20 ("Prudence suggests that this information [concerning the $1,000 payment] should have been disclosed prior to trial."); p. 22 ("the information in the notes [regarding the $1000 payment] is arguably favorable to Kott"); p. 30 ("information in the 302s could arguably have been used to cross-examine Allen" about his assistance being based on their long-standing friendship rather than bribery); p. 35 ("This information [about Allen seeking sworn affidavit from child sex partner falsely claiming that they did not have sex] may be favorable to Kott, since it may have allowed him to ask Allen whether he had ever asked another individual, including Person A, to make a false declaration"); p. 40 ("the information contained in the notes and the e-mail [about Allen being a horrible witness and stating that Kott "never extorted me"] may have been favorable"); p. 41 ("Kott perhaps could have been able to use the notes and e-mail [described immediately above] to (1) cross-examine Smith about whether … Kott … thought the payments were bribes or gifts, and (2) cross-examine Allen about whether he thought Kott was extorting him").

The government contends, however, that no matter how true those newly disclosed facts are, it does not matter – they are not "material" enough to warrant relief. The government comes to this conclusion, first, by arguing that much of the suppressed evidence is too embarrassing to have been admissible.  Response, pp. 31-33.  This argument conflicts with controlling authority holding that evidence concerning a witness's criminal exposure and hence his motive to curry favor with the government is relevant to credibility and impeachment and, hence, is admissible under the Federal Rules of Evidence as well as *Brady v. Maryland*, 373 U.S. 83 (1963).  This same rule applies even if the evidence is embarrassing.  Section II.

The government comes to this conclusion, next, by arguing that tapes rather than testimony formed the basis for Mr. Kott's conviction.  *E.g.*, Response, pp. 30-31.  This government argument conflicts directly with its prior assertions about the importance of the Allen and Smith testimony.  It also conflicts with this Court's prior assertions about the importance of admitting evidence bearing on Mr. Allen's credibility at Mr. Kott's trial so that the jury would be the ones who could judge credibility.  Section III.

Additionally, the government comes to its conclusion that the suppressed evidence was immaterial by arguing that the balance of the evidence was sufficient for conviction and that each single bit of suppressed evidence, alone, cannot undermine the sufficiency of the balance of the evidence.  Response, pp. 13-33.  This belies a misunderstanding of the nature of the *Brady* inquiry; despite the government's assertions to the contrary, it is not a sufficiency of the evidence inquiry and it cannot be conducted by viewing each undisclosed item in isolation.  The question is the likely cumulative impact of all of the new evidence.  Section IV.

The government continues that some of the documents do not really mean what they seem to mean, or are contradicted by statements in other portions of the documents, so they cannot be taken at face value.  The government nevertheless failed to answer some of the most basic questions raised by these documents, such as where the incriminating documents that VICTIM 5 gave to the government are now; who suppressed them; whether A.U.S.A. Russo really did advise Officer Vandergrift to stop his investigation because of a pending federal investigation of Mr. Allen and which investigation that was; and whether the documents memorializing statements that the government itself now deems "favorable" to Mr. Kott were purposefully or negligently

withheld.   The answers to these and other questions contained in the Motion to Dismiss Appendix G are critical to determining the nature of the illegality and hence the legal standard for reviewing it; the answers are also critical to fashioning an appropriate remedy.   The government's position – that the suppressed documents are irrelevant but declining to provide answers to critical questions about what they really mean and why they were suppressed – leaves this Court with only one means for answering those questions:  conducting an evidentiary hearing.  Section V.[1]

## II.   THE GOVERNMENT ERRS BY CHARACTERIZING EMBARRASSING FACTS AS INADMISSIBLE

### A.   Embarrassing Facts Concerning a Government Witness's Prior Bad Acts Are Admissible, Even When They Concern Sexual Acts

The government argues that Bill Allen's substantial, undisclosed exposure to criminal prosecution for prior sex crimes is "irrelevant, collateral" material brought forward to embarrass.  Response, pp. 31-32.  Indeed, the government claims that it is not only irrelevant, but prejudicial and inadmissible under the Federal Rules.  *Id*.   This is so, according to the government, primarily because "[a]llegations of sexual misconduct are not probative of a witness' character for truthfulness."  Response, p. 32.

---

[1] The government tries to claim the high road by asserting that the government itself "initiated" the review and "filed" the motion triggering release of the suppressed *Brady* material.  Response, p. 4.  In fact, in the midst of the Ninth Circuit appeal and after the government's dismissal of the case against former Senator Stevens, Mr. Kott himself – through undersigned counsel – filed the motion for disclosure of *Brady* information.  Mr. Kott himself had to argue that *Brady* applied to the appeal process, and that the Ninth Circuit had the authority to order disclosure of suppressed *Brady* material during the pendency of the appeal.  *See United States v. Kott*, CA No. 07-30496, Motion for Disclosure of *Brady* Material on Appeal (Dkt. 48, filed on 4/13/09).  Only after that motion was filed and the Court ordered a response (Dkt. 49, filed on 4/14/09) from the government did the government acquiesce and file its Motion for Remand for Appellant's Release Pending Resolution of this Case (Dkt. 57, filed on 6/4/09).  A copy of the docket sheet from the Ninth Circuit case is attached as Appendix A.

Allegations of sexual misconduct might not be probative of truthfulness, but exposure to criminal prosecution and the consequent motive it gives a witness to curry favor with the government certainly is – even if the criminal prosecution is related to a sex crime rather than, say, a drug crime.

This is clear from the decision in *Lindh v. Murphy*, 124 F.3d 899 (7th Cir. 1997), *cert. denied*, 522 U.S. 1069 (1998).  *Lindh v. Murphy*, 521 U.S. 320 (1997), was decided by the U.S. Supreme Court shortly after the AEDPA (Anti-Terrorism and Effective Death Penalty Act) was enacted; it ruled that the AEDPA amendments did not apply to a petitioner who filed his habeas corpus petition before the AEDPA was enacted.  On remand to the appellate court, the substantive claims were then addressed.  The petitioner alleged a confrontation clause violation because he was precluded from cross-examining the prosecution's expert about allegations of sexual impropriety with patients that might expose him to criminal prosecution, professional problems, and conviction.  The Court of Appeals ruled that precluding cross-examination on this subject violated the confrontation clause because cross-examining the expert about his own exposure to loss of faculty positions and prestige and the spectre of prison could raise the possibility that the expert was shading his views to curry favor with the state.

The *Lindh* court came to this conclusion even though the proposed cross-examination subject did not relate directly to the subject of the expert's testimony, that is, to defendant's mental state during two murders and a third attempted murder.  The *Lindh* court came to this conclusion even though there was no evidence that the expert's testimony changed after his troubles began.  The *Lindh* court emphasized that the prosecution presented the witness as a qualified expert with integrity.

The government did the same thing with Mr. Allen.  The government elicited testimony from him about how he always told the truth to the government,[2] and they argued that his testimony was more credible than Mr. Kott's testimony was in closing.  Because the psychiatric testimony in *Lindh v. Murphy* could not be verified or refuted empirically, the expert witness's credibility was deemed critical.  Since the competing versions of the meaning of the tapes given by Smith and Allen on the one hand, and Kott, on the other hand, cannot be verified or refuted empirically either, those witnesses' credibility was critical in this case, also.  The *Lindh* court ruled that denial of cross-examination may have altered the jury's decision, and remanded for issuance of a writ.

The *Lindh v. Murphy* decision, because it concerns allegations of a witness's prior sexual misconduct, strongly compels the conclusion that the allegations of sexual misconduct are equally relevant and probative in this case.  This is true not necessarily because they concern sex, but because they relate to misconduct, exposure to criminal prosecution and moral opprobrium, and the consequent motive those concerns give a witness to curry favor with the government.   The fact that the allegations concern sex and hence might be embarrassing does nothing to lessen the probative value that exposure to criminal prosecution has on a witness's credibility.  In fact, it increases their probative value; if the witness seeks to shield himself from the opprobrium and stigma associated with revelation of those past crimes rather than just from punishment, then the witness has more incentive to curry favor with the government, not less.

---

[2] "Yes, I've – I've told them the – the truth.  Sometimes they thought it was something different, and I'd tell them, no that's not true.  And they might not have liked it, but I told them the truth." *Id.*, TR7: 11 (Appendix B).  "I – when I made the deal with you guys, I – I said I'm not going to – I'm not going to – it's got to be the truth.  And I have – I – I done exactly the truth in – and I don't think anybody could dispute that."  TR8:19 (Appendix C).

This conclusion is also clear from the decisions cited in the original Motion to Dismiss, despite the fact that the government claims that the Motion did not "cite[] to any federal rule of evidence, case law, or other legal authority" compelling admission of such evidence.  Response, p. 31.  In fact, that Motion argued – correctly – that the government has a constitutional obligation to disclose prior criminal conduct of its witnesses, whether or not that criminal conduct resulted in a conviction; that the government has an affirmative duty to seek this information out; and that the allegations of Bill Allen's criminal wrongdoing with child and adult prostitutes fit within the scope of this disclosure obligation.[3]  The Motion cited to decisions holding that the fact that a witness's acts had not resulted in any adverse government action – as is the case with Mr. Allen's prior criminal sex acts – did not relieve the government of the disclosure obligation; disclosure is still required.[4]  The Motion explained that where, as here, the witness was not guaranteed leniency for those prior crimes but instead had merely an opportunity to obtain such leniency from his current cooperation, the government must still disclose the opportunity even without an explicit promise of leniency.[5]

---

[3] *United States v. Perdomo*, 929 F.2d 967, 980 (3d Cir. 1991) (government failure to disclose prior arrest and conviction record of main witness was *Brady* violation requiring reversal; prosecution team with duty to disclose includes both investigative and prosecution personnel); *United States v. Osorio*, 929 F.2d 753, 760 (1st Cir. 1991) (government erred in failing to disclose that its witness had been involved with trafficking drugs for 18 months prior to trial, even though a different A.U.S.A., not the one trying the case, was the one with knowledge of that criminal background).

[4] *United States v. Phibbs*, 999 F.2d 1053, 1089 (6th Cir. 1993), *cert. denied*, 510 U.S. 1119 (1994) (*Brady* material includes evidence of "suggested wrongdoing" by witnesses; "The Supreme Court, in construing the government's obligation under *Brady v. Maryland* and its offspring, has drawn no distinction between such evidence, and that pertaining to proven or admitted criminal behavior.").

[5] *Reutter v. Solem*, 888 F.2d 578, 578-82 (8th Cir. 1989).

In this case, we know that Mr. Allen was desperate to avoid the embarrassment and stigma associated with the revelation of those past crimes.[6]  He therefore had even more incentive to curry favor with the government than if he were simply trying to avoid criminal prosecution for those crimes.

Still, if it were criminal prosecution alone that he were trying to avoid, that would still be relevant.  The reason is that his exposure to incarceration for those suppressed crimes was so great.  For each violation of the Mann Act, by transporting a woman across state lines for prostitution activity, Mr. Allen would face up to ten years in prison.  18 U.S.C. § 2421.  The suppressed evidence memorializes one such crime. For each act of sexual abuse of a minor in the second degree - for "sexual penetration with a person who is 13, 14, or 15 years of age," etc. - he would face up to ten years in prison (with escalating penalties depending on the number of convictions).   AS  11.41.436 (criminalizing sexual abuse of minor in second degree); AS  12.55.125(d)  (10-year penalty for this Class B felony, and listing presumptive penalties for first and successive convictions).  The suppressed evidence suggests that there were many, many, instances of this sort of conduct. For each act of prostitution, even with an adult – a crime that includes offering a fee in return for sexual conduct – he would be guilty of a separate misdemeanor punishable by up to 90 days in jail.   AS  11.66.100 (criminalizing prostitution as Class B misdemeanor); AS  12.55.135 (sentences of imprisonment for

---

[6] As the Motion explained, this was so important to Allen that he would "become unglued," in the words of Agent Kepner, each time he learned that any of it might become public.  As this Court will remember, Agent Kepner wrote that she appreciated the "heads up" she received from a particular reporter if he was going to run a story on this subject because, "this allowed KEPNER time to prepare ALLEN.  *ALLEN would become unglued whenever an article would appear involving allegations related to the APD sexual investigation.*"  BRADY 4629 (emphasis added).

misdemeanors).  The suppressed evidence suggests scores upon scores of such episodes. His exposure was extensive.

The embarrassing nature of Mr. Allen's prior crimes does not relieve the government of the constitutional obligation to disclose them, and would not have relieved this Court of the constitutional obligation to admit them.  It heightens, rather than diminishes, their probative value.

> **B.** **Embarrassing Facts Concerning a Government Witness's Credibility Are Admissible Not Only Under *Brady*, But Under the Federal Rules, as Long as They are Not Collateral – And Evidence Bearing on Bias and Credibility is Not Collateral Especially Where as Here the Witness Testifies About His Truthfulness**

The government suggests that this Court would have prohibited impeachment with any of this information about Mr. Allen's prior criminality because anything related to sex crimes or attempts to induce a witness to lie under oath was collateral and hence could not be proven with extrinsic information.  *E.g.*, Response, p. 36.

Evidence about Mr. Allen's prior, serious, federal and state crimes, and about his inducement to a witness to lie under oath about whether he committed such crime, however, is not collateral.  A subject is collateral if it is not related to the witness's direct testimony.[7]  But Mr. Allen testified on direct examination that he was telling the truth,

---

[7] *Cf. United States v. Negrette-Gonzales*, 966 F.2d 1277, 1280 (9th Cir. 1992) (defense witness takes responsibility for cocaine and exonerates defendants, but refuses to answer government's question on cross-examination to reveal the names of her suppliers due to fear of reprisal; treating this under the same analysis as a Fifth Amendment assertion, this Court ruled that "The identity of her source was collateral to the issues at trial and to her testimony on direct," so striking her testimony was reversible error); *United States v. Lord*, 711 F.2d 887 (9th Cir. 1983).

and that he always told the truth to the government;[8] his credibility was therefore a substantive matter on which he testified.

A subject is collateral if it is designed to test credibility only generally, rather than by reference to the case.[9]  But whether Mr. Allen had a motive to curry favor with the government to avoid additional prosecution and minimize his state and federal criminal exposure applied specifically to his credibility in this case, and evidence of bias is always admissible.  "Bias" includes various factors that can cause a witness to fabricate or slant testimony, such as prejudice, self-interest, or ulterior motives.  *See Davis v. Alaska*, 415 U.S. 308, 316 (1974).  In fact, evidence that is inadmissible on other grounds may still be admissible to prove bias.[10]  Thus, even if the government points to some other rule that might have made this impeachment material inadmissible, that would not be conclusive.  The federal constitutional right to introduce evidence of bias would be.

### C.   Embarrassing Facts Concerning a Government Witness's Drinking and Memory Are Admissible Where They Bear on His Ability to Perceive, Remember, and Relate Facts

Finally on this point, the government asserts that the facts contained in the Motion to Dismiss about Mr. Smith's difficulties with perception and memory, particularly

---

[8] "Yes, I've – I've told them the – the truth.  Sometimes they thought it was something different, and I'd tell them, no that's not true.  And they might not have liked it, but I told them the truth." *Id.*, TR7: 11 (Appendix B).  "I – when I made the deal with you guys, I – I said I'm not going to – I'm not going to – it's got to be the truth.  And I have – I – I done exactly the truth in – and I don't think anybody could dispute that."  TR8:19 (Appendix C).

[9] *See United States v. Sturgis*, 578 F.2d 1296, 1300 (9th Cir.), *cert. denied*, 439 U.S. 970 (1978) (question is "whether the questions propounded are designed to test sincerity and truthfulness or are 'reasonably related' to the subject covered on direct.").

[10] *United States v. Abel*, 469 U.S. 45, 55 (1984) (although specific instances of conduct inadmissible under Rule 608(b) for purpose of showing "character for untruthfulness," still admissible to show bias); *United States v. James*, 609 F.2d 36, 46-47 (2d Cir. 1979), *cert. denied*, 445 U.S. 905 (1980).

*United States v. Kott* – 3:07-cr-00056-JWS
REPLY RE:  MOTION TO DISMISS - 10

during the summer before Mr. Kott's trial and at the time of his trial, are also embarrassing.  Response, pp. 37-39.  The government asserts that those facts are, consequently, also inadmissible, couching its assertion as a legal argument under Rules 401-403 and asserting that such evidence would be prejudicial but non-probative.  In fact, the government characterizes the suppressed evidence as data about Smith's "drinking habits," rather than about his credibility.  Response, p. 38.

If the suppressed evidence were only repetitive data about Smith drinking to excess, it might not be very probative.  But it was not.  It was evidence that during the summer before and the September of Mr. Kott's trial, Rick Smith was under so much psychological stress and deteriorating so badly that his drinking interfered with his ability to function, impacted his work, worried his friends, was associated with suicidal tendencies, and even got Agent Kepner concerned.  *See* Motion to Dismiss, pp. 25-28.

This may be embarrassing, but that is not the reason that it is relevant.  It is relevant and admissible because – as the Motion to Dismiss stated but the government ignores – an adverse witness's psychiatric problems which interfere with his ability to perceive, remember, or relate facts is probative of his credibility whether these problems stem from stress, alcohol, suicidal ideation, or all of the above.  *United States v. Smith*, 77 F.3d 511, 512 (D.C. Cir. 1996) (reversing denial of motion to vacate due to government's failure to disclose psychiatric history of its witness); *United States v. Pryce*, 938 F.2d 1343, 1345 (D.C. Cir. 1991), *cert. denied*, 503 U.S. 941 (1992) (violation of confrontation clause to prohibit inquiry about witness's hallucinations 3 months before charged event; they "are obviously relevant to a witness's ability to discern reality" later);

*United States v. Mohawk*, 20 F.3d 1480, 1486 (9th Cir. 1994) (cross-examination as to

"mental instability" provides "significant[] impeach[ment]").[11]

### III.   THE GOVERNMENT ERRS BY CHARACTERIZING THE ALLEN AND SMITH TESTIMONY, IN HINDSIGHT, FOR THE FIRST TIME, AS IMMATERIAL

#### A.   The Government's Claim that the Allen and Smith Testimony Were Immaterial And Their Credibility a Non-Issue Is a Hindsight Re-Characterization of Its Trial Position; the Government Should Be Estopped From Denying The Importance of Credibility

The government now asserts that credibility was not an important issue at trial. It

argues for the first time that the tapes, not the testimony, formed virtually the sole basis

for Mr. Kott's conviction. *E.g.*, Response, p. 7. It even criticizes the Motion to Dismiss

for beginning with the single word record quote, "Credibility." Response, p. 10. The

government argues that this is a misquote, because the government's closing argument

reference to "Credibility" referred to Mr. Kott's credibility, not to Mr. Allen's or Mr.

Smith's credibility. Government's Response, p. 10 ("Kott implies that the government

was referring to the credibility of its own witnesses" in his Motion to Dismiss).

Credibility cannot be argued in a vacuum. In a case like this where both the

defendant – Mr. Kott – and the key witnesses against him – Messrs. Allen and Smith –

testify, and they give different versions of the meaning of taped statements (as either

---

[11] *See also United States v. Johnson*, 820 F.2d 1065 (9th Cir. 1987) (referring to cross-examination of bank tellers about "agitated mental state" to discredit identifications); *Colley v. Sumner* 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986) (referring to defense cross-examination that appropriately elicited "damaging testimony regarding her drug use and past emotional problems"); *United States v. Brown*, 770 F.2d 768, 770 (9th Cir. 1985), *cert. denied*, 474 U.S. 1036 (1986) (witnesses appropriately and extensively cross-examined about mental problems, and jury properly instructed to consider mental problems in evaluating credibility); *United States v. Heath*, 528 F.2d 191, 193 (9th Cir. 1975) ("fact of insanity or mental abnormality ... may be provable, on cross-examination or by extrinsic evidence, as bearing on credibility").

braggadocio and bluster or as the honest truth), then the credibility of both sides' witnesses is at issue. The government obviously concedes that it was arguing that Mr. Kott was the less credible one in that quote. In other portions of its closing argument, however, the government clearly asserted that Messrs. Smith and Allen were the more credible ones – in other words, the government asserted just what they denied asserting in the quote above, that is, "that the government was referring to the credibility of its own witnesses." *E.g*., TR 14:25 (government argues Bill Allen testified truthfully: "when you consider the testimony of Bill Allen consider that testimony in light of what the defendant Pete Kott told you about Bill Allen and his credibility and his truthfulness."). Bill Allen himself even testified, in open court, that he was credible and truthful and had never lied to the government. TR7: 11 (Appendix B); TR8:19 (Appendix C).

So, yes, Mr. Kott does assert that the government argued the credibility of its own witnesses and the lack of credibility of Mr. Kott. The quotes from the record, immediately above, support this characterization.

The government now downplays the importance of Bill Allen's credibility at Pete Kott's trial in order to undermine the materiality of the suppressed evidence showing his prior inconsistent statements and his vast, undisclosed, exposure to criminal prosecution. In other contexts, however, the government has argued that Mr. Allen's testimony at Mr. Kott's trial was both credible and critical. The government, for example, credited Mr. Allen with "substantial assistance" in its investigation. United States of America's Sentencing Memorandum, *United States v. Allen*, 3:07 CR-00057-JWS, Dkt. 54, p. 8. In Mr. Kott's own case, the government elicited Mr. Allen's own truth-telling testimony

quoted in the paragraphs above and then argued Mr. Allen's credibility in closing. TR14:25.

Similarly, although the government now downplays the importance of Rick Smith's testimony at Pete Kott's trial to undermine the materiality of the suppressed evidence showing Smith's unreliability, the government sang a different tune before. In the past, the government gave Mr. Smith extensive credit for his cooperation in the prosecution of Mr. Kott. Government's Motion for Departure Based on Substantial Assistance, *United States v. Smith*, 3:07 CR-00058-JWS, Dkt. 42, p. 3 ("Smith's Trial Testimony Helped Convict Victor Kohring and Peter Kott"; "Smith deserves partial credit for the convictions of former Alaska State Representatives victor Kohring and Peter Kott. Smith testified at length in both trials, and he held up well on cross examination. … [H]e was helpful on a number of fronts, including how he could describe to the jury the value of the corrupt assistance received from Kohring and Kott.").

Thus, the government elicited testimony regarding credibility and then argued that Mr. Smith and Mr. Allen were credible witnesses in Mr. Kott's trial. The government has asserted to this Court in the context of other cases that both Allen – and especially Smith – helped their case against Kott at trial "on a number of fronts." The government should be estopped from asserting a contrary position to this Court now to gain a tactical advantage in Mr. Kott's case.[12]

---

[12] *See Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990), *cert. denied*, 501 U.S. 1260 (1991) ("The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such petitional changes have an adverse impact on the judicial process."); *Stevens Technical Services, Inc. v. SS Brooklyn*, 885 F.2d 584, 588 (9th Cir. 1989) ("Judicial estoppel precludes a party from asserting a position in a current legal proceeding which is contrary to the position that party previously asserted in another.").

If the government is permitted to take this contrary position, this Court should put it into context:  the government is seeking to justify its decision to bolster the credibility of Allen and Smith at trial while depriving Kott of material that would have rebutted those assertions of credibility.  That flies in the face of controlling precedent.  In *United States v. Reyes*, 577 F.3d 1069, 1077-78 (9th Cir. 2009), for example, the Ninth Circuit began by emphasizing that "the government's duty [is] 'to ensure fair and impartial administration of justice for all Americans." *Id.*, 577 F.3d at 1077.  "For this reason, it is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt."  *Id.* (citations to Ninth Circuit authority omitted).  As a result, any evidence that tends to "put the lie" to government witness testimony or "arguments" at trial – that is, that tends to rebut such evidence or inferences – must be disclosed to the defense.  *Id.*

That is precisely the category into which the statements undermining Allen's and Smith's credibility fall:  they are evidence that tends to put the lie to Allen's and Smith's testimony about their own truthfulness and their own version of what the tapes meant.

**B.**   **The Government's Claim that the Allen and Smith Testimony Was Immaterial Conflicts With This Court's Pre-Trial Recognition that the Jury Was Entitled to All Relevant Evidence to Evaluate Their Credibility**

The government's argument that Allen's and Smith's credibility are essentially irrelevant to Kott's conviction also conflicts with this Court's prior assertions concerning the importance of evidence bearing on Allen's credibility at Kott's trial.[13]

---

[13] As the Motion to Dismiss already explained, this Court itself stated, at the hearing on the admissibility of certain evidenced obliquely referenced by the government in closed court:  "what I want to be able to do is to allow Mr. Kott the opportunity to cause the jury to think long and hard about whether they should believe Mr. Allen.  I mean, Mr. Allen's testimony, like that of Mr. Smith, is critical here, and he deserves a right to – to probe that."  TR7:15.  This Court

*United States v. Kott* – 3:07-cr-00056-JWS
REPLY RE:  MOTION TO DISMISS - 15

**C.**     **Whether Kott Would Have Voted the Same Way Is Material –**
**It Tends To Undermine the Government's Argument that**
**Payments Were Intended to Influence**

The government argues that Mr. Kott erred in asserting that he would have favored the same "20/20" legislative agenda as VECO even without the payments. Specifically, it contends that Mr. Kott favored PPT legislation at a tax rate different than the "20/20" rate favored by Mr. Allen and, hence, that suppressed documents suggesting Kott and Allen were of the same mind on the PPT 20/20 legislation were wrong; they may have jointly favored passage of some law, but not that one.  Response, p. 26 ("Information that Kott would have worked generally on the PPT even if Allen had not paid him any money is consistent with the government's evidence, and Kott's own recorded admission, that Kott supported the legislation but would not have supported the 20% tax rate but for Allen.").

Unfortunately for the government, other suppressed documents directly contradict its position.  An unattributed handwritten note at BRADY 3693 explicitly states, "Pete always was a 20/20 guy."[14]

Thus, the government's conclusion that "Even if Kott would have 'worked on' the PPT without Allen's bribes, it is beyond dispute that he followed Allen's instructions about which version to support and how to go about securing that version of the PPT,"

---

continued, "Allen may have more incentive now [at the time of trial, as opposed to when he made his deal] that he knows he is tangled up in something beyond just Mr. Kott and Mr. Kohring." *Id.*, TR7:16.  *See also id.*, TR7:30 Court states:  "one's incentive to cooperate is affected by the exposure that one has.  So the more you admit, the more incentive you have to cooperate, I suppose.").

[14]  In context, these seem to be handwritten agent notes concerning a debriefing of Mr. Weyhrauch.  BRADY 3685-3700 (handwritten notes); BRADY 3666-72 (FBI 302 seemingly based on those notes).

Response, p. 26, is incorrect.  It is not beyond dispute.  The suppressed evidence disputes it.

Finally, the government asserts that "[i]t is not a defense to bribery to claim that Kott would have worked on the PPT absent Allen's bribes."  Response, p. 26.

Whatever may be said about the disputed relevance of this information to Mr. Kott's bribery conviction, this Court cannot forget that Mr. Kott was also convicted of extortion and conspiracy with extortion as one of its objects.  Pete Kott's motive to vote for the PPT 20/20 bill regardless of whether he received VECO payments or not is certainly relevant to the elements of those crimes.  The reason is that proof of inducement into a bargained-for exchange for particular action is necessary to prove Hobbs Act extortion "when an official receives a campaign contribution."  *McCormick v. United States,* 500 U.S. 257, 274 (1991).  In other words, donations from constituents in advance of a legislator's favorable votes on certain legislation is not a crime, only donations solicited from them specifically in exchange for official action are; in the words of *McCormick*,

> … *The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking.* This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

*Id*., 500 U.S. at 272-73 (emphasis added).

Another aspect of this quid pro quo element was discussed in *United States v. Montoya*, 945 F.2d 1068 (9th Cir. 1991); in that case, the Ninth Circuit held that the government must also prove that the defendant himself induced the quid pro quo

payments.  *Accord United States v. Aguon*, 851 F.2d 1158, 1160, 1166, 1172 (9th Cir. 1988) (en banc) (to obtain conviction under Hobbs Act for extortion "under color of official right," government must prove that defendant induced the improper payment).

There were at least two arguable campaign contributions made to Kott's re-election that were placed under consideration on the extortion charge:  the $7,993 payment to Kott's son supposedly so he could work on Kott's reelection campaign, and the poll provided for the reelection.  With regard to these contributions, the government certainly had to prove a bargained-for exchange with Kott for specific official action under *McCormick* – and an exchange that the defendant himself induced, under *Aguon* and *Montoya*.[15]  In fact, it is likely that the same quid pro quo element applies to even the non-campaign contributions.  *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001); *United States v. Collins*, 78 F.3d 1021 (6th Cir. 1996) (quid pro quo requirement does apply to all Hobbs Act extortion prosecutions); *United States v. Hairston*, 46 F.3d 361 (4th Cir.), cert. denied, 516 U.S. 840 (1995) (same); *United States v. Martinez*, 14 F.3d 543 (11th Cir. 1994); *United States v. Garcia*, 992 F.2d 409 (2d Cir. 1993).  *Cf. United States v. Tucker*, 133 F.3d 1208 (9th Cir. 1998) (noting but reserving this issue).

The suppressed evidence that Pete Kott would have voted the same way without the payments was therefore material to his convictions.  While some evidence was presented on this point through both Kott (TR7:60-77) and Allen (TR6:49-50), it was

---

[15] It is true that the Court in *McCormick* declined to decide "whether a quid quo pro requirement exists in other contexts, such as when an elected official receives gifts, meals, travel, expenses, or other items of value."  *Id.*, at 274, n.10.  And a later controlling case holds that extortion is complete when the "public official has obtained a payment to which he is not entitled, knowing that the payment was made in return for official acts."  *Evans v. United States*, 504 U.S. 255, 268 (1992).  Those decisions might bear on the treatment of non-campaign contributions.  But with regard to the campaign contributions received by Kott, there is definitely a quid pro quo element.

obviously not convincing to the jury.  The suppressed evidence, coming from a separate, third party, might well have been.

> **D.**     **Whether Bill Allen Insisted on Paying Pete Kott for Flooring "Services" Rather than Political Favors Is Material – It Undermines the Government's Claim that the Payments Were for Extortion and Bribes**

The government next claims that whether Bill Allen insisted on paying Pete Kott for his floor refinishing services is not material, because trial evidence shows that the payments were to funnel money to Mr. Kott's son.  Response, p. 13.  All this shows is that the suppressed evidence conflicts with the disclosed evidence.  It does not prove that the disclosed evidence is more trustworthy than the suppressed evidence.

> **E.**     **Whether Bill Allen's $5,000 Downpayment on Kott's Truck Was a Loan or a Bribe Was a Critical Disputed Issue at Trial, as Even the Government's Sentencing Memo Shows**

The government is correct that Mr. Kott was the one who testified about Bill Allen's $5,000 down payment on his truck.  What he stated, however, was that it was a loan, not a bribe.  *See* Response, p. 28.  The government then challenged this assertion on cross-examination with questions implying that it was a gift rather than a loan.  The government's Response itself admits this.  *Id*., p. 29.  The government thus implied that Mr. Kott was lying when he said it was a loan.

The government argued this point not only in closing, but even to this Court at sentencing.  As its sentencing memorandum states:

> With regard to the $5,000 payment from Allen, the government submits that the payment was an illegal transaction intended to secure Kott's official support on matters of interest to VECO.  The defendant testified at trial that the payment was a truck loan, but admitted that he had made no payments to Allen and that there were no terms for repayment or interest.  The defendant also received this payment at a time when he had previously undertaken official acts for Allen with regard to other

legislation concerning natural gas issues.  Moreover, as Allen made clear during trial, Allen's practice was to curry favor with Kott and other politicians by providing them benefits knowing that he could use their support down the road.  Critically, at the time Allen provided Kott the $5,000 payment, the PPT was not an issue before the Legislature.  Thus, the $5,000 payment bears all the indicia of an illegal payment ….

Government's Sentencing Memorandum, Dkt. 289, p. 5.

Meanwhile, the government had suppressed evidence within its exclusive possession showing that Mr. Kott was actually telling the truth, and that it was a loan. The right to present witnesses is especially strong where they would *rebut* evidence introduced by the government from which the jury might infer an element of the crime.[16] The government was therefore obligated to disclose that evidence and it would have been admissible.  *United States v. Reyes*, 577 F.3d 1069, 1077-78 ("it is improper for the government to present to the jury statements or inferences it knows to be false or has very strong reason to doubt.");

### F.    Whether This Court Called the Evidence "Overwhelming" Before the Suppressed Evidence Was Revealed is Irrelevant

The government appeals to this Court's assertion that "the evidence against Kott at trial was overwhelming."  Response, p. 7 (quoting Dkt. 35, p. 2).  This Court made that statement in the Order and Opinion denying Mr. Kott's Motion for Bail Pending Appeal (Dkt. 360) filed on January 30, 2009.  This was before the suppression of evidence favorable to Mr. Kott was revealed after June of 2009.

Whether this Court characterized the evidence as "overwhelming" before the suppressed evidence was revealed is irrelevant.

---

[16] *See, e.g., United States v. Whitman*, 771 F.2d 1348, 1351 (9th Cir. 1985); *United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980).

IV. **THE GOVERNMENT ERRS BY FOCUSSING ON THE SUFFICIENCY OF OTHER EVIDENCE TO CONVICT; THE *BRADY* INQUIRY IS NOT A SUFFICIENCY OF EVIDENCE INQUIRY**

A. <u>The Government Errs in Asserting that The Sufficiency of the Admitted Evidence is Key</u>

The government argues that the strength of the evidence as presented at trial is key to a good *Brady* analysis. *E.g.*, Response, p. 5. But it criticizes undersigned counsel for arguing that the *Brady* inquiry is not a sufficiency of the evidence test.[17]

According to the Supreme Court, however, the test for materiality "is *not a sufficiency of evidence test.* ... One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 506 (1995). Thus, it is *correct* to say that this Court does not analyze the sufficiency of the admitted evidence to determine whether the government suppressed material evidence; the other admitted, evidence, can be considered but this Court must ask whether the newly disclosed material puts it in a "different light."

B. <u>The Government Errs in Evaluating Each Suppressed Bit of Evidence in Isolation</u>

The government goes on to list selected bits of suppressed evidence bit by bit, and to contrast each favorable bit of suppressed information with a contrary bit of newly disclosed information. *E.g.*, Response pp. 13-14 (reiterating suppressed evidence showing that Allen paid Kott over $7,000 extra for flooring work as a bonus because of

---

[17] Response, p. 11 ("Kott's motion, moreover, only mentions the word 'prejudice' once, and there his misstates the law. *Id.* at 56 ("The sufficiency of other, admitted, evidence, has no bearing on the prejudice inquiry when a *Brady* violation is at issue.")).

its quality rather than as a bribe, but then contrasting that with another notation from the suppressed evidence that Allen knew the invoice would be "inflated to compensate Kott"); *id.*, pp. 20-21 (addressing $1,000 cash payment to Kott and reiterating that the suppressed evidence shows that Allen states he did *not* tell Kott why he was giving him the $1000 and did *not* tell him to make the contribution to the Murkowski campaign, but contrasting that with other newly disclosed evidence showing that Smith, instead, asked him to make the contribution and with contradictory trial testimony that Allen did ask Kott to make the contribution); *id.*, pp. 23-25 (referring to previously suppressed evidence that "there were numerous times when VECO purchased polls for its own information and permitted candidates to 'piggyback' onto the polls" but contrasting it with suppressed evidence that Smith "routinely purchased polls for candidates"); *id.*, pp. 25-26 (referring to previously suppressed evidence of Allen admitting that "Kott would have worked on the PPT … if [Allen] did not pay him any money" and contrasting it with "substantial direct evidence of Kott's state of mind" rendering "Allen's speculative response about Kott's state of mind … unremarkable").

The government's approach is wrong.  First, the *Brady* inquiry does not evaluate the importance of each suppressed bit of evidence bit by bit, but cumulatively.  "In deciding whether the withheld evidence satisfies this standard, [this Court] evaluate[s] its effect cumulatively, not item-by-item."  *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1007), *cert. denied*, 523 U.S. 1133 (1998) (citing *Kyles*, 115 S.Ct. at 1567).  If the credibility of the challenged witness was critical, then undisclosed evidence undermining credibility is material.  *Id*.  It "need not have been independently admissible to have been material."

*Carriger v. Lewis*, 132 F.3d 463, 481. *Accord Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327 (11th Cir. 2009).

Second, the fact that some cumulative *inculpatory* evidence was suppressed does not excuse the suppression of *exculpatory* evidence. The jury should have gotten to hear the favorable stuff, not just the prejudicial stuff.

Third, if the government now believes that the suppressed evidence was so easy to rebut, *e.g.*, Response, p. 19 ("Kott's argument, which is based on an interview summary of Allen describing the flooring invoice scam, takes information out of context and is inconsistent with the chronology …"), why did they not just disclose it to defense counsel so that the jury rather than the prosecutors could have made the decision on its materiality?

Using the correct approach, the government's quotes (on pp. 21-22 above) just show that Bill Allen contradicted himself. The government chooses to credit Mr. Allen's statements inculpating Pete Kott. They have every right to argue that position to a jury. They do not, however, have the right to withhold the contradictory information on the ground that the government, rather than the jury, would prefer to believe the unfavorable remarks rather than the favorable ones.

C. **The Government Errs in Asserting that Post-Trial Documents Are Irrelevant; Since *Brady* Applies to "Evidence," Not Documents, Post-Trial Documents Concerning Pre-Trial Evidence Are Totally Relevant**

The government asserts that Mr. Kott incorrectly relies largely upon "witness statements made two years after trial," as if that immunizes them from *Brady*.[18]   But it

---

[18] Response, p. 2.  *Id*., p. 37 ("Some of the information upon Kott relies, such as Smith's alleged bad memory, was *created* more than two years after Kotts' trial, and thus could not have been disclosed to Kott before his trial.") (emphasis added).

was not the suppressed documents created post-trial, revealing Allen's and Smith's prior inconsistent statements, motives to curry favor, and perception and recall problems, that are material; it is the fact that those motives, disabilities, and inconsistencies *existed earlier* that is the relevant, discloseable, matter. The fact that documents finally memorializing the pre-existing evidence were not created until later underscores the fact that information was suppressed; it does not provide a reason to continue to hide the evidence.

Any other conclusion would read *Brady* as being applicable only to documents. Instead, it is applicable to "evidence," *United States v. Bagley*, 473 U.S. 667, 682 (1985), and "evidence" includes information that has not been memorialized but, instead, has been secreted.

> **D.**   **Neither the Supposedly Speculative nor the Supposedly Cumulative Nature of the Suppressed Evidence Excuses the Suppression or Makes it Any Less Material**
>
> > **1.**   ***Cumulative nature of suppressed evidence about additional expectations of leniency does not excuse suppression***

The government claims it is irrelevant whether Mr. Allen received additional, undisclosed, rewards, for testifying, such as an opportunity to minimize his exposure to criminal prosecution or even embarrassment from his prior sex-related crimes. Controlling Ninth Circuit precedent, however, holds that testimony given in exchange for any reward is "inherently untrustworthy." *Carriger v. Stewart*, 132 F.3d 463, 479.

Further, proof of additional possible rewards, inconsistencies, or memory and perception problems, cannot be considered irrelevant where the jury apparently believed the government in part, judging from their acquittal of one count. Actually, common sense dictates the opposite conclusion – where, as here, the government's case is based on suspect,

inherently unreliable, witnesses, but a conviction is obtained as though that testimony were believable, then any undisclosed evidence that further undermines the witnesses' credibility might well have cast the admitted evidence in a different light.

>    **2.      Speculative nature of suppressed evidence about Bill Allen's expectation of leniency does not excuse suppression**

The government contends that the documents do not conclusively prove that the government was aware of additional serious sex-related crimes against Mr. Allen that it declined for some reason to prosecute.  The government makes this claim while at the same time declining to explain what the APD documents could mean, other than the fact that the government was aware of those crimes and affirmatively requested the City of Anchorage to refrain from investigating and prosecuting.  The government thus seems to argue that this was no more than coincidence, and that it had no obligation to disclose such coincidences.

But it is not just actual benefits to government witness that must be disclosed; in addition, promises of benefits, implicit assurances of benefits, and anticipated benefits must all be disclosed under *Brady*.[19]  That is the basis for the rule that the government must disclose its witnesses' upcoming *opportunities* for benefits from the government, even

---

[19] For example, courts consistently hold that even witness agreements made in prior, unrelated cases constitute *Brady* material, because evidence of past deals and compensation is *relevant to what the government witness might expect to receive* from current testimony.  *United States v. Leja*, 568 F.2d 493, 498-99 (6th Cir. 1977) (reversed due to exclusion of evidence of past deals and compensation because they are relevant to what government witness might expect from current testimony); *United States v. Salsedo*, 607 F.2d 318, 332 (9th Cir. 1979) (citing *Leja* with approval).  *Accord United States v. Williams*, 954 F.2d 668, 669 (11th Cir. 1992) (reversed because relevant evidence regarding how much the government paid an informant in prior cases was excluded on the basis that such evidence would be too prejudicial to the government's case).

where the government has made no specific promise of benefit to the witness.[20]   It is irrelevant that part of the witnesses' bargains or expectations were revealed pre-trial; the full extent of government witness expectation of benefits or to avoid detriments cannot be dismissed as cumulative but instead must be disclosed.[21]

> **V.   THE GOVERNMENT IGNORES DISCOVERY REQUESTS ABOUT WHY IT SUPPRESSED EXCULPATORY EVIDENCE IN THE FIRST PLACE, THEN ARGUES THAT KOTT FAILED TO PROVE "WILLFUL MISCONDUCT" REQUIRING DISMISSAL; SINCE WILFULNESS IS RELEVANT TO THE STANDARDS OF REVIEW AND REMEDY, AN EVIDENTIARY HEARING IS NEEDED TO FIND THE ANSWERS**
>
> **A.   Why Willfulness Matters and What the Government Has Failed to Reveal About Its Suppression of Evidence**

The government fails to answer some of the most basic questions raised but left unanswered by these documents, such as where the incriminating documents that Victim 5 gave to the government are now; who suppressed them; whether A.U.S.A. Russo really did advise Officer Vandergrift to stop his investigation because of a pending federal investigation of Mr. Allen and which investigation that was; and whether the documents memorializing statements that the government itself now deems "favorable" to Mr. Kott, such as the statement that "he [Kott] never extorted me," BRADY 4670, were purposefully or negligently withheld.   The government asserts (at times) that none of this matters.

The government concedes at other points in its brief, however, that whether the evidence was negligently or purposefully withheld is of critical importance to determining the proper remedy.  Response, pp. 43-44 (arguing dismissal is extraordinary

---

[20] *Reutter v. Solem*, 888 F.2d 578, 578-82.

[21] *United States v. Smith*, 77 F.3d 511, 512 (D.C. Cir. 1996).

remedy applicable only to purposeful government misconduct not to negligent failure to disclose).

Indeed, whether the evidence was purposefully withheld is critical to analyzing other matters, also.  Mr. Kott alleged that the government elicited witness testimony that conflicted directly with evidence within the government's exclusive possession.  To obtain post-trial relief on such a claim, the defendant must prove that "the prosecutor knew, or should have known, of the perjury."  *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir. 1982). However, he need only prove that there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Id.*; *Grisby v. Blodgett*, 130 F.3d 365 (9th Cir. 1997) (applying "any reasonable likelihood" standard post-conviction).[22]  This is a "standard of materiality much more favorable to the defendant" than that of *Brady*. *Gilday v. Callahan*, 59 F.3d 257, 267 (1st Cir. 1995), *cert. denied*, 516 U.S. 1175 (1996) (applying such standard on post-conviction).[23]

The government argues that Mr. Kott's motion failed to prove "willful misconduct warranting outright dismissal."  Response, p. 3.  It conclusorily asserts "there was no false testimony or evidence in this case, therefore there could have been no *Napue*[24] errors."  Response, p. 12 n.5.  The government continues that some of the

---

[22] *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1998) (same); *Carter v. Johnson*, 131 F.3d 452, 458 (5th Cir. 1997), *cert. denied*, 523 U.S. 1099 (1998) (same); *Ely v. Matesanz*, 983 F. Supp. 21 (D. Mass. 1997) (same).  *Accord United States v. Steinberg*, 99 F.3d 1486, 1490 (9th Cir. 1996), *overruled on other grounds by, United States v. Foster*, 165 F.3d 689 (9th Cir. 1999) (if prosecutor uses perjury, "conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury verdict"); *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (same); *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989).

[23] Even unwitting use of perjured testimony violates due process if there is a reasonable probability that absent perjury, the result of the proceeding would have been different.  *United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994).

[24] *Napue v. Illinois*, 360 U.S. 264 (1959).

documents do not really mean what they seem to mean, or are contradicted by statements in other portions of the documents, so they cannot be taken at face value.  Response, pp. 13-14; 20-21; 23-26 (discussed above at pp. 22-23).

But the government had exclusive possession and control over the suppressed evidence in the newly released documents.  It also has exclusive insight into what some of them really mean and, hence, whether the suppression was purposeful or negligent and what is the full meaning of some of the documents.  Specifically, government employees, agents or witnesses have exclusive possession of the answers to the questions detailed in the table contained in our letter to government counsel, attached as Appendix G to the Motion to Dismiss.  To reiterate, we list some of the most key questions that the government should be ordered to answer, to allow this Court to determine the materiality of the *Brady/Giglio*[25]*/Napue* violations and the appropriate remedy:

1.    Why did A.U.S.A. Russo tell Officer Vandergriff to stop his investigation of Bill Allen and who else was part of that decision; and; with which federal investigation of Mr. Allen might the APD investigation have interfered?

2.    Why was the document memorializing A.U.S.A. Russo's request not memorialized at the time it was made?

3.    Was Mr. Allen aware of his exposure to criminal prosecution for prior crimes involving prostitution, child exploitation, and Mann Act violations? How often did he become "unglued" when he feared they would be publicized?

4.    How much time did Mr. Allen face if those crimes had been pursued?

5.    Why did the government make an in camera pre-emptive strike against use of any information concerning Mr. Allen's prior association with a victim, while none of the other prior crimes and exposure were raised; why did the government assert that there was no connection between the prior

---

[25] *Giglio v. United States*, 405 U.S. 150 (1972).

crimes and the current case given how those prior crimes bear on credibility, bias, and motion to curry favor?

6. Why did the government suppress evidence that Bill Allen became "unglued" at the prospect that his prior crimes might be publicized?

7. Why did the government suppress evidence that Bill Allen told them "Kott never extorted me"?

8. Why did the government suppress all of the 4,700 pages of documents that were disclosed to undersigned counsel only recently?

9. Why did the government suppress evidence that Bill Allen told them that the $5,000 he gave Pete Kott for his truck was a loan, not a gift?

10. Why does the government continue to deny that there was no investigation of Bill Allen in 2004, when material from the stacks of the suppressed evidence shows that the federal government's Polar Pen investigation was under way at that time and Mr. Allen was under investigation, also?[26]

11. Where are the incriminating documents that VICTIM 5 gave to the government in 2004?

12. Where are the notes from the initial meeting with Bill Allen in which he was convinced to cooperate; what mention or inferences about his prior crimes occurred at that meeting?

---

[26] As discussed in the Motion, APD Det. Vandergriff wrote, on November 4, 2004, that, "In March 2004 I was advised by AUSA Frank Russo to not actively investigate this case as it might interfere with a federal investigation *involving Allen* and Josef Boehm." APD 47.

The fact that there was an investigation "involving Allen" as early as March 2004 is also corroborated by Agent Kepner's affidavit of February 20, 2009, showing that the Polar Pen Investigation started in 2003 and that by January 2004 it had expanded significantly. JOY 15-20. *See also* BRADY 2643 (May 20, 2004, letter to Alaska Public Corruption Offices Commission re Complaint Alleging Violations of Campaign Finance Disclosure Laws Beverly Masek, showing early 2004 activity on corruption investigation); BRADY 1111 (original interview notes of Frank Prewitt Public Corruption Matter dated 4/19/04, by SA B.W. Goodee, from right around the time of the February, 2004, interview with VICTIM 5 and the March, 2004, request from A.U.S.A. Russo that the APD stop its investigation); BRADY 1218 (Part of a series of 302s on corruption issues from 2004; this one is dated 10/14/04, with contact info for Smith, Allen, Lethard, and Chan); BRADY 4594 (Chad Joy arrived in Anchorage in January 2004; "Soon after arriving in Anchorage, I was made co-case agent on a sensitive public corruption case, POLAR PEN 194A-AN-13620. …" ); BRADY 4604 ("KEPNER advised the Operation Polar Pen (OPP) investigation was officially opened in July of 2003"; original focus was on public corruption in private prison system.).

**B.**    <u>**Mr. Kott Has Satisfied the Threshold Requirements to Obtain**</u>
<u>**an Evidentiary Hearing**</u>

The answers to these questions are critical to determining the nature of the illegality and hence the legal standard for reviewing it; the answers are also critical to fashioning an appropriate remedy.  The government's position – that the newly disclosed documents are irrelevant but declining to provide answers to critical questions about what they mean and why they were suppressed – leaves this Court with only one means for answering those questions:  conducting an evidentiary hearing.

The government asserts that Mr. Kott is not entitled to an evidentiary hearing.  It does not, however, recite the standard for obtaining such a hearing.

If this were a post-trial 28 U.S.C. § 2255 motion, then Mr. Kott's motion would be construed like a complaint in which the criminal defendant must make a colorable claim that, if proved, would entitle him to relief.  *Smith v. McCormick*, 914 F.2d 1153, 1170 (9th Cir. 1990).  In that context, with all of the limitations on a post-trial motion in place, the question for this Court would be whether the petitioner's factual allegations, *if proved*, would establish the right to relief – not whether the allegations are proven by the initial filing itself.[27]  A federal district court is not required to grant an evidentiary hearing where the allegations are "conclusory and wholly devoid of specifics."[28]  But it is required to grant an evidentiary hearing where the allegations provide facts rather than bare allegations and

---

[27] *See United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996), *cert. denied*, 520 U.S. 1269 (1997) (§ 2255 movant needs "to *allege* specific facts which, if true, would entitle him to relief") (emphasis added); *Van Pilon v. Reed*, 799 F.2d 1332 (9th Cir. 1986).

[28] *Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

those facts, if proven, would entitle the movant to relief.  *Bashor v. Risley*, 730 F.2d at 1234.[29]

This is not a post-conviction § 2255 motion, and so the strict § 2255 standard for obtaining such an evidentiary hearing does not apply.  Instead, the Ninth Circuit's remand order allows this Court to fashion whatever procedures are best suited to the task of uncovering the truth.  Given the government's decision against providing any additional discovery or answers, this Court should now order an evidentiary hearing.

## VI.    CONCLUSION

"[S]ome of the information that the government recently disclosed could be considered favorable to the defendant."  Response's Conclusion, p. 46.  This is especially true of evidence such as, for example, Bill Allen's suppressed statement that "he [Kott] never extorted me."  BRADY 4670.  The government never really explains who suppressed such clearly exculpatory evidence and why.  Yet whether the suppression was willful or negligent is just as critical to choosing the proper remedy as it is to choosing the proper framework – *Brady*, *Giglio*, or *Napue* – for analysis.  This Court can make a *preliminary* decision on materiality, based on the pleadings.  But it cannot make a full determination on that point, or any determination on willfulness, without either additional government concessions or an evidentiary hearing.

---

[29] Certainly, if the claims are "palpably incredible or patently frivolous," no hearing is required.  *Marrow v. United States*, 772 F.2d 525, 526 (9th Cir. 1985) (citation omitted).  The government makes no claim that it is patently incredible to believe the information contained in the Motion to Dismiss.  In fact, the government concedes that the quotations and documents contained in that motion are from its own records and that "prudence dictates" that some of it should have been disclosed, given that it seems "favorable" to the defense.  Response, pp. 12, 40, 46.  Hence, the exception for patently incredible claims is inapplicable here.

This Court should therefore grant the motion to dismiss or, alternatively, it should reverse the convictions and allow the government to retry Mr. Kott.  If this Court rules that such relief is not warranted based solely on the pleadings, it should order an evidentiary hearing to flesh out how much evidence was suppressed and whether suppression was negligent or willful.

DATED THIS 4th day of November, 2009.

Respectfully submitted,

s/Sheryl Gordon McCloud
Sheryl Gordon McCloud, WSBA No 16709
Attorney for Defendant-Appellant,  Peter Kott
Law Offices of Sheryl Gordon McCloud
710 Cherry Street
Seattle, WA 98104-1925
(206) 224-8777; (206) 623-5951 (fax)
sheryl@sgmccloud.com

CERTIFICATE OF SERVICE

I certify that I caused to be electronically filed the foregoing with the Clerk of

the Court of the United States District Court for Alaska by using the CM/ECF system

on November 4, 2009.

I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the district court CM/ECF system.

DATED this 4th day of November, 2009.

s/Sheryl Gordon McCloud
Sheryl Gordon McCloud, WSBA No 16709
Attorney for Defendant-Appellant,  Peter Kott
Law Offices of Sheryl Gordon McCloud
710 Cherry Street
Seattle, WA 98104
(206) 224-8777; (206) 623-5951 (fax)
sheryl@sgmccloud.com