UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> PETER KOTT, ) <br> ) <br> Defendant. ) <br> _____) | ORDER AND OPINION <br><br> 3:07-cr-056 JWS <br><br> [Re: Motion at Docket 404] |

## I. MOTION PRESENTED

At docket 404, defendant Peter Kott moves to vacate his conviction and dismiss the indictment or, in the alternative, for discovery of additional *Brady* information and an evidentiary hearing. At docket 415, the government opposes the motion. Kott replies at docket 418. Oral argument was heard on November 17, 2009.

## II. BACKGROUND

On May 3, 2007, Kott and Bruce Weyhrauch, both of whom had been serving in the Alaska legislature at times pertinent to this case, were indicted on several charges arising out of a public corruption conspiracy orchestrated by Bill Allen, who was the chairman of a large oil field services company, VECO. Prior to trial, the charges against Weyhrauch were severed because the United States took an interlocutory appeal of this court's ruling on a legal issue. That issue is now pending before the United States Supreme Court. In addition to the conspiracy charge in Count 1 for violating 18 U.S.C. § 371, Kott faced three substantive counts. Count 2 charged Kott with Hobbs Act extortion under color of official right in violation of 18 U.S.C. § 1951(a). Count 4

charged him with federal programs bribery in violation of 18 U.S.C. § 666(a)(1)(B), while Count 6 charged Kott with honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. The other counts charged crimes by Weyhrauch.[1]

Those identified in Count 1 as conspirators included Allen, Rick Smith, who was VECO's vice-president for government relations, Kott, Weyhrauch and State Senator A. Influencing activity in the Alaska State Legislature relating to tax legislation commonly known as the PPT–a subject of immense importance to VECO and its customers–was the primary focus of the conspirators' activities. The PPT was also of great importance to the State of Alaska, for the legislation was intended to dramatically effect taxation of the oil industry, from which the bulk of Alaska's revenue is derived. The indictment alleged numerous overt acts committed in connection with the conspiracy, and in Count 2, the indictment identified the following particular acts by Kott: receipt of funds totaling $8,993, $2,750 in polling expenses, and a future contract as a lobbyist for VECO.

Trial commenced on September 5, 2007. The principal witnesses at trial were Allen, Smith, and Kott, but it is fair to say that the most significant evidence came in the form of audio-visual recordings of activities in Suite 604 of the Baranof Hotel in Juneau, whence Allen and Smith orchestrated the effort to control the outcome of legislative action on the PPT. These recordings were surreptitiously made pursuant to Title III authorization. On September 25, 2007, the jury returned verdicts convicting Kott on Count 1 (conspiracy), Count 2 (Hobbs Act extortion under color of official right), and Count 4 (federal programs bribery). Kott was acquitted of the honest services wire fraud charge in Count 6.

Kott appealed his sentence and conviction. Meanwhile, the same team of federal lawyers and FBI agents who were involved in prosecuting Kott undertook (with the assistance of additional federal prosecutors) the prosecution of United States Senator Ted Stevens. Stevens was prosecuted in Washington, DC on charges that he failed to disclose gifts received from Allen on the financial disclosure reports he was required to

---

[1] Docket 2.

prepare and file pursuant to the Ethics in Government Act. Stevens was convicted on several counts. However, subsequent to his conviction, it was discovered that the team of prosecutors had failed to provide appropriate discovery to Stevens' lawyers. After the matter was reviewed by a new group of government lawyers, the government moved to dismiss all charges against Stevens with prejudice based on failure to disclose *Brady* material pertaining to a key witness, namely Bill Allen.[2]

Having become aware of the developments in the Stevens case, shortly before oral argument on his appeal was to be heard, Kott filed a motion seeking to require the United States to disclose all evidence "favorable to the accused" pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963). As noted above, Allen was also a primary witness in the Kott prosecution, as was Rick Smith. While the new team of government lawyers was still in the process of reviewing the available information looking for any additional *Brady* material that had not been provided to Kott, the government took the extraordinary step of asking the Court of Appeals to remand Kott's case to this court for further proceedings. The government explained that "the [review] process has uncovered material that, at this stage, appears to be information that should have been, but was not disclosed to [Kott] before trial."[3] The government also withdrew its opposition to Kott's motion for bail pending appeal.

The Court of Appeals granted Kott's motion for bail pending appeal, upon terms and conditions which were set by this court, and remanded the case to this court with explicit instructions to determine "(1) whether the government breached its obligation of full disclosure under *Brady* and *Giglio v. United States*, 405 U.S. 150, 154 (1972); (2) if so, whether the defendant was prejudiced by the violation; and (3) if the defendant was prejudiced, what the remedy should be."[4] This court has also been instructed "to follow whatever procedure it deems appropriate and expeditious in its discretion."[5] Kott was

---

[2]*See United States v. Stevens*, Criminal Case No. 08-231 (D. D.C.).

[3]Docket 370 at 2.

[4]*Id.* at 3.

[5]*Id.*

promptly released from prison on the same terms which had applied prior to trial pending resolution of the matter on remand.[6] Thereafter, the government certified that it had completed its review and production of *Brady* materials to Kott.[7] The newly-disclosed materials include FBI 302s and other documents which would be useful in attacking the credibility of Allen and Smith, and which show inconsistent statements by Allen and Smith. The matter has been fully briefed, argued, and is now ripe for decision.

### III. DISCUSSION

**A. Governing Law**

In *Brady*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[8] Since *Brady*, the Court has expanded the scope of the prosecution's duty to disclose evidence in the absence of a request by the accused,[9] as well as the breadth of impeachment and exculpatory evidence.[10] Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[11] Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor."[12] In order to comply with *Brady*, therefore, "the individual prosecutor

---

[6] Docket 388.

[7] Docket 401.

[8] 373 U.S. at 87.

[9] *U.S. v. Agurs*, 427 U.S. 97, 107 (1976).

[10] *U.S. v. Bagley*, 473 U.S. 667, 676 (1985).

[11] *Id.* at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995).

[12] *Kyles*, 514 U.S. at 438.

-4-

has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."[13]

In a related line of cases, the Court held that due process may be violated where the government fails to disclose perjury by or the cooperation of its chief witnesses. In *Napue v. Illinois*, the Court considered the implications of perjured testimony by a prosecution witness on a criminal defendant's due process rights.[14] The Court held that "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness."[15] In *Giglio v. United States*, the Court extended *Brady* and *Napue* to evidence of promises made to government witnesses in exchange for cooperation.[16] The Court held that the failure of the government to disclose a promise made to a witness would constitute a violation of due process requiring a new trial, reasoning that "credibility as a witness was . . . an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."[17]

In *Strickler v. Greene*, the Court addressed an ineffective assistance of counsel claim based on a defense attorney's failure to file a motion for disclosure under *Brady*, and summarized a prosecutor's disclosure obligations under *Brady* and its progeny as follows:

> These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern

---

[13] *Id.* at 437.

[14] 360 U.S. 264 (1959).

[15] *Id.* at 269.

[16] 405 U.S. 150, 154 (1972).

[17] *Id.* at 154-155.

Case 3:07-cr-00056-RRB   Document 429   Filed 01/13/10   Page 5 of 20

impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'[18]

The *Strickler* Court continued that:

> *This special status explains both the basis for the prosecution's broad duty of disclosure and our conclusion that not every violation of that duty necessarily establishes that the outcome was unjust.* Thus the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence-that is, to any suppression of so-called '*Brady* material'-although, strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.[19]

The government has conceded that it failed to disclose some favorable evidence, but no true "*Brady* violation" may be found unless this court concludes that such evidence is material, and its suppression has prejudiced Kott. A violation may be based on failure to disclose evidence useful for impeachment purposes.[20]

Where suppressed evidence contains information that could have been used to impeach a central witness for bias, the due process concerns associated with *Brady* parallel a defendant's right to confront his accuser. As the Court noted in *Davis v. Alaska*,

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the

---

[18]527 U.S. 263, 281 (1999) (quoting *Berger v. United States,* 295 U.S. 78, 88 (1935)).

[19]*Strickler*, 527 U.S. at 281.

[20]*Paradis v. Arave*, 240 F.3d 1169, 1179 (9th Cir. 2001) (quoting *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) ("'[e]vidence is material if it might have been used to impeach a government witness, because if disclosed and used effectively, it may make the difference between conviction and acquittal.'")).

cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.[21]

*Davis* concluded that where the accuracy and truthfulness of a witness' testimony are key elements in a prosecution, a claim of bias is admissible in order to afford a basis for an inference of undue pressure exerted by the prosecution in order to obtain helpful testimony.[22] As the Ninth Circuit has explained:

> The use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril. . . . By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom. . . . Because the government decides whether and when to use such witnesses, and what, if anything, to give them for their service, the government stands uniquely positioned to guard against perfidy. By its actions, the government can either contribute to or eliminate the problem. Accordingly, we expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery. This responsibility includes the duty as required by *Giglio* to turn over to the defense in discovery all material information casting a shadow on a government witness's credibility.[23]

---

[21] 415 U.S. 308, 316-317 (1974) (internal quotations and citations omitted).

[22] *Id.* at 317-18.

[23] *U.S. v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).

-7-

In determining whether the failure to disclose *Brady* material undermines confidence in the outcome of the trial, the court must weigh the withheld evidence "'in the context of the entire record.'"[24] In order to find actual prejudice, there must be "a reasonable probability that the suppressed . . . evidence affected the verdict,"[25] in that "had [this] evidence been disclosed to the defense, the result of the proceeding would have been different."[26]

**B. Significance of the information not disclosed**

Kott has grouped the newly-disclosed evidence into six categories: (1) prior acts of wrongdoing by Allen; (2) opportunities for leniency, which refers to evidence indicating that Allen received or anticipated benefits from cooperation with government agents and lawyers; (3) other government files, which includes documents produced by or in the possession of the Anchorage Police Department ("APD") relating to Allen; (4) prior inconsistent statements, including statements by Allen or Smith to the FBI that were allegedly inconsistent with their trial testimony; (5) government agent rough notes, which include notes by FBI agents or APD officers; and (6) information concerning psychological, memory and alcohol abuse problems pertaining primarily to Smith. The court finds it more useful to consider the newly disclosed evidence using a somewhat different taxonomy.

### 1. Prior Inconsistent Statements

The parties have ably mustered their arguments regarding the significance of all the newly-disclosed evidence of alleged prior inconsistent statements. In the court's view, the government easily has the better of the argument regarding this evidence. Evaluated within the totality of materials produced, taken in the context of an entire interview or document, considered in the proper time sequence, and compared to the very substantial evidence at trial from the surreptitious recordings, the newly disclosed

---

[24] *Price*, 566 F.3d at 913 (quoting *U.S. v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007), quoting, in turn, *Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002)).

[25] *United States v. Gillespie*, 852 F.2d 475, 481 (9th Cir.1988).

[26] *Bagley*, 473 U.S. at 682.

-8-

evidence in this broad category is not material, because there is no reasonable probability that its timely production and use by the defense would have resulted in different verdicts.[27] In terms of the mandate from the Court of Appeals, this court concludes that the government breached its obligation to provide full disclosure of exculpatory information, but that the breach was not material and so did not prejudice Kott. The court is similarly not persuaded by trial counsels' assertion that they would have advised Kott against testifying had the newly-disclosed evidence been available prior to trial.[28] Such a contention is speculative at best. In the face of Allen and Smith's testimony, discussed further below, as well as the extensive, incriminating audio-visual recordings, the court cannot conclude that the newly-disclosed evidence of prior allegedly inconsistent statements would have impacted Kott's decision to testify.

### 2. Smith's Condition

Kott claims that the newly-disclosed evidence also undermines Smith's credibility to the extent it reveals that Smith had previously undisclosed mental health, memory, and alcoholism problems around the time of Kott's trial.[29] The government contends that Kott was aware of Smith's drinking tendencies because Kott "was one of Smith's drinking partners."[30] The court agrees. Kott, who was among Smith's drinking partners, was in a better position than anyone to know of Smith's alcoholism. Such information was therefore at Kott's disposal during trial, and he could have attempted to impeach Smith at that time with evidence of his drinking problem, subject to admissibility concerns. Therefore, the government was under no obligation to disclose additional evidence of Smith's drinking problem prior to trial. The same applies to evidence of Smith's memory problems, which does not appear to have come to light until two years after Kott's trial,

---

[27]*See* docket 415 at 13-31, with which this court generally agrees and which points out the flaws in Kott's arguments regarding the significance of this information.

[28]Dockets 420 and 421.

[29]Docket 404 at 25-28.

[30]Docket 415 at 38.

-9-

and therefore could not have been disclosed to Kott.[31]  In any event, evidence of a failing memory may have been of limited value to Kott in light of the fact that the government was frequently required to refresh Smith's recollection.

On the other hand, the government should have disclosed evidence that Smith was suicidal in the months leading up to trial.  In *United States v. Pryce*, the Circuit Court for the District of Columbia held that a trial court may not limit cross-examination relating to the fact that a government witness had experienced hallucinations three months prior to testifying.[32]  The Ninth Circuit also has found that the government is under an obligation to disclose impeachment evidence that bears on the credibility of witnesses,[33] including evidence of poor mental and emotional health that may be provable on cross-examination.[34]  Here, the government failed to disclose evidence that, prior to trial, Smith "was having significant psychological problems because of the pending Federal criminal case against him" and that the FBI's lead agent, Mary Beth Kepner, "was concerned SMITH was possibly even suicidal because of this situation."[35]  Although Kepner discussed Smith's mental health issues with his wife and others, she and government prosecutors failed to advise defense counsel that one of its chief witnesses was in an unstable mental state.  Kepner and the prosecution team were under an obligation to disclose evidence of Smith's poor mental health, which Kott might have used to undermine Smith's credibility in a material way.[36]  However, although the evidence regarding Smith's condition should have been disclosed, its potential utility to Kott does

---

[31]Docket 404 at 27 (discussing 2009 interview with Smith in which he states that his memory is "terrible.").

[32]938 F.2d 1343, 1345-46 (D.C. Cir. 1991); *accord United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) ("Mental records can be material as impeachment evidence because they can cast doubt on the accuracy of a witness' testimony.").

[33]*Brumel-Alvarez*, 991 F.3d at 1461.

[34]*U.S. v. Heath*, 528 F.2d 191, 193 (9th Cir. 1975).

[35]Docket 405-4 at 10 (BRADY 004630).

[36]*Kyles*, 514 U.S. at 437-38.

-10-

not undermine confidence in the jury verdict. There is no reasonable probability that the outcome would have been different in light of the very damning evidence from the audio/video recordings, as well as the testimony from Allen and Kott himself. In sum, although the government should have disclosed the information about Smith's condition, the newly disclosed evidence is not material, and so the failure to disclose it did not prejudice Kott.

Finally, Kott contends that the newly-disclosed evidence also reveals that Smith admitted that Kott would have supported pipeline legislation regardless of any financial incentive because such legislation comported with Kott's own views.[37] Evidence that Kott would have voted in favor of the PPT legislation regardless of financial incentive is irrelevant in determining whether Kott was guilty of bribery or extortion.[38] Lastly, Kott argues that the newly-disclosed documents indicate that the government influenced Smith's testimony during the trial of Victor Kohring, who, like Kott, was indicted and convicted on the strength of Allen and Smith's testimony.[39] The government concedes that evidence of government influence on Smith's testimony likely should have been disclosed, but argues that Kott has failed to establish that such evidence would have had a material effect on the outcome of the trial.[40] The court agrees. Even if there were evidence that the government improperly influenced Smith during the Kohring trial, which took place after Kott's trial, it is not relevant to Kott's trial.

---

[37]Docket 404 at 28.

[38]*Omni Outdoor Advertising, Inc.*, 499 U.S. at 378.

[39]Docket 404 at 28-29.

[40]Docket 415 at 40.

-11-

### 3. Allen's Credibility

There was a considerable amount of newly-produced evidence relating to Allen's credibility. Kott argues at length how its use by the defense might have affected the outcome of the trial. While the government is correct that there was ample evidence in the surreptitious recordings themselves to support the convictions, it is also true that Allen's testimony was a major part of the government's case. Were Allen's testimony not considered important, the communication problems flowing from Allen's motorcycle accident alone would have weighed against using him as a witness. When those limitations are supplemented by newly produced information showing how difficult it was for prosecutors to deal with Allen, it is fair to say that the government's own assessment of Allen's testimony was that it would play an important role in the prosecution. Having seen and heard all the evidence, this court concurs in that assessment.

The newly-disclosed documents contain interview sheets from the APD investigation into Allen's sexual exploitation of minors, conduct which could give rise TO serious criminal charges under both state and federal law. Anchorage Police Department ("APD") files reflecting detailed information implicating Allen in the sexual exploitation of minors and efforts to conceal that behavior were released by the government to Kott pursuant to the Ninth Circuit's order. The documents before this court confirm that there was an extensive investigation into these matters at least as early 2004.[41] The APD documents establish, among other things, that Allen engaged in solicitation of one individual, "VICTIM 5," and sexual exploitation of "CHILD VICTIM 1" in approximately 1997.[42] Both Assistant United States Attorney Frank Russo and FBI Agent John Eckstein were present at the interviews in which this information was revealed by VICTIM 5.[43] These documents also establish that Allen paid for VICTIM 5's drug rehabilitation and "wrote it off on his taxes."[44]

---

[41] *See* Docket 405-4 at 11-13 (BRADY 004657-59).

[42] Docket 405-4 at 11-13 (BRADY 004657-59).

[43] *Id.*

[44] *Id.* at 13 (BRADY 004659).

-12-

The government contends that information in the APD files cannot be considered *Brady* evidence. The court disagrees. "Normally, the criminal record of a witness is available to the prosecutor and, as it bears on the witness's credibility, must be turned over to the defendant."[45] It would be reasonable, therefore, to conclude that the agents and government attorneys in the corruption investigation had conducted a background check of its chief witness, which would have revealed that Allen was mentioned in connection with the Boehm investigation and prosecution, and that Allen himself was being actively investigated by the APD for sex crimes.[46] Moreover, federal prosecutors and agents were privy to the APD's investigation and were present during at least some of the interviews conducted by the APD. These interviews were conducted at around the same time federal prosecutors were beginning to investigate the various players - including Allen and Kott - in the political corruption scandal, and it is reasonable to infer that information relating to Allen's illicit sexual conduct was within the knowledge of federal agents and prosecutors charged with running the corruption investigations.[47] Given the overlapping investigative operations among the FBI, U.S. Attorney's office, and APD since at least early 2004, knowledge of this evidence may be imputed to the prosecutors charged with investigating and prosecuting Kott. While there is no direct evidence that Allen's cooperation with the government in the corruption trials was motivated by his desire to avoid charges for his alleged sexual crimes, Kott was deprived of knowledge of the potential additional benefit Allen may have hoped to receive in exchange for his cooperation.[48]

The question remains whether evidence of Allen's prior misconduct, and his potential additional motivation to curry favor with the government, could be introduced to

---

[45] *U.S. v. Strifler*, 851 F.2d 1197, 1202 (9th Cir. 1988).

[46] *U.S. v. Boehm*, 3:04-cr-0003 (filed Jan. 22, 2004).

[47] *Lindh v. Murphy*, 124 F.3d 899, 901 (7th Cir. 1997).

[48] As discussed below, although it is unclear whether Allen knew that the government was involved in delaying or halting the APD investigation of his alleged sex crimes in exchange for his cooperation, such an inference is reasonable.

impeach him for bias. The Ninth Circuit has held that the government must disclose the true criminal record of its witnesses.[49] In a case like this one, where a witness does not have a prior criminal record, but rather is only alleged to have engaged in wrongdoing, this rule is applicable.[50] Indeed, the First Circuit held in an analogous case, *United States v. Osorio*, that "[a]n Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness."[51] The court continued that "[t]he prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge."[52] The Ninth Circuit has also made clear that evidence of a witness' prior criminal acts, regardless of conviction, may be used to prove bias.[53]

The government contends, based on Federal Rule of Evidence 608(b), that "allegations about Allen's criminal conduct could only be relevant for two reasons: to impeach his character for truthfulness or to impeach him for bias . . . [and n]either applies here."[54] The court disagrees. As an initial matter, under Ninth Circuit law "'[e]vidence is material if it might have been used to impeach a government witness, because if disclosed and used effectively, it may make the difference between conviction

---

[49] *Bernal-Obeso*, 989 F.2d at 332-33.

[50] *See, e.g.*, *U.S. v. Veras*, 51 F.3d 1365, 1374 (7th Cir. 1995) (allegations that witness had "taken money belonging to government informants, [lied] on search warrant applications, and [stolen] money during police searches . . . were serious enough . . . [to conclude that] the evidence was valuable to [defendant] for impeachment purposes."); *Perdomo*, 929 F.2d at 980 ("Soto's undisclosed criminal record constitutes exculpatory evidence that the defense could have used to impeach Soto on cross-examination."); *Osorio*, 929 F.2d at 761; *U.S. v. Dekle*, 768 F.2d 1257, 1263 (11th Cir. 1985) (material relevant to impeachment - prior criminal acts of government witnesses - should have been disclosed).

[51] *Osorio*, 929 F.2d at 761.

[52] *Id.*

[53] *U.S. v. Ray*, 731 F.2d 1361, 1364-65 (9th Cir. 1984) ("When the case against a defendant turns on the credibility of a witness, the defendant has broad cross-examination rights."); *see also Price*, 566 F.3d at 912.

[54] Docket 415 at 31.

-14-

and acquittal.'"[55] The Seventh Circuit's opinion in *Lindh v. Murphy*, cited by Kott, discusses bias in a context similar to the case at bar.[56] *Lindh* held that the prosecutor's failure to disclose evidence of an expert witness' impeachble past, which included evidence that the expert had "sexually abused some of his patients, was about to lose his medical license and his prestigious faculty positions, and stood a chance of going to prison" constituted a violation of the defendant's rights under the Confrontation Clause.[57] The court reasoned the defendant "could have used the excluded evidence . . . to show that [the witness] had a reason to be biased in the prosecutor's favor, hoping that helpful testimony would mitigate his criminal punishment."[58] This was so even though the prosecuting authority who had charged defendant Lindh was a different one than the prosecuting authority investigating the witness,[59] and despite the fact that there was no evidence that the witness was promised that helpful testimony might have helped his cause.[60]

Here, the government actually did take steps to slow down, if not halt, the investigation of Allen's sex crimes, which Detective Vandergriff apparently memorialized in a document he typed on November 4, 2004.[61] That was done in connection with the prosecution of Joe Boehm and his co-defendants, one of whom was a woman who had

---

[55] *Paradis,* 240 F.3d at 1179 (quoting *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (en banc)).

[56] 124 F.3d 899, 900 (7th Cir. 1997).

[57] *Id.*; *accord Davis v. Alaska*, 415 U.S. 308, 316 (1974).

[58] *Lindh*, 124 F.3d at 900.

[59] *Id.* at 901.

[60] As the *Davis* Court noted, in order to make an inquiry into bias effective, defense counsel must be permitted "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." 415 U.S. at 318.

[61] Docket 404 at 35 (quoting APD 47 ("In March 2004 I was advised by AUSA Frank Russo to not actively investigate this case as it might interfere with a federal investigation involving Allen and Josef Boehm.")).

-15-

been involved with Allen when she was a minor. However, the effort to influence the APD investigation was not undertaken in connection with any charges against Allen. Indeed, the government lawyer who made the request had nothing to do with the prosecution of Allen, because (with the exception of Messrs. Bottini and Goeke) the office of the United States Attorney for the District of Alaska had recused from the various corruption cases involving Allen.[62] Although it is possible, it has not been shown that Allen even knew that the federal government made any contact with APD regarding an investigation which involved his activities with the minors. Nevertheless, he was clearly aware of his exposure to some sort of criminal prosecution for his actions with the children. An inference that cooperation in the prosecution of Kott and others would be beneficial in connection with that criminal exposure is at least as reasonable here as the parallel inference in *Lindh*. Were *Lindh* a Ninth Circuit decision, admission of evidence of Allen's prior misconduct would perhaps be required. However, *Lindh* is not controlling authority, and this court does not find it sufficiently persuasive to support the proposition that the evidence would be admissible in Kott's trial without further scrutiny under the Federal Rules of Evidence.

The government failed to disclose evidence of Allen's impeachable past to Kott, and proceeded to rely on Allen's testimony to support Kott's conviction. The court therefore concludes that the non-disclosed evidence of Allen's conduct is relevant to a significant issue, Allen's bias.[63] This conclusion begs the question of whether this relevant evidence would have been admissible at trial. As an initial matter, the evidence might be excluded pursuant to Rule 611(a)(3), which directs the court to exercise control over interrogation of witnesses that may harass or embarrass them. It is obvious that the newly-disclosed evidence would embarrass Allen. It is also obvious that Allen is the most significant witness against Kott (although not the most significant source of

---

[62]It was not until recently, with a new United States Attorney in office, that the recusal was lifted.

[63]*Ray*, 731 F.2d at 1364-65 (possible bias of government witness based on prior wrongful conduct deserved jury scrutiny because witness testimony was crucial to conviction); *see also Price,* 566 F.3d at 912-13.

-16-

evidence, for that is found in the surreptitiously recorded audio-visual tapes), and that the newly-disclosed evidence is important with respect to Allen's credibility. Under these circumstances, the court has no trouble concluding that Rule 611 would not preclude use of the newly disclosed information.[64]

Under Rule 403, as pertinent here, relevant evidence will not be excluded unless its probative value is substantially outweighed by the risk of confusing the issues, misleading the jury or needless cumulation of evidence. As the government points out in its briefing, evidence of Allen's sexual misdeeds is of a prurient nature. Indeed, the conduct alleged involves such sordid and reprehensible acts that it would ignite the jury's interest in the possibility that Allen was engaged in sex crimes. Thus, admission of the evidence creates a serious danger of confusing the issues which the jury actually needs to decide – whether Kott is guilty of the crimes charged, not whether Allen is guilty of sex crimes. It also risks misleading the jury by causing them to focus on Allen's escapades at the expense of their evaluation of all the other evidence. Finally, it bears emphasis that Kott had ample opportunity to show, and at trial did show, Allen's bias based on the substantial value of Allen's co-operation concerning punishment for the public corruption crimes to which he had pled guilty. A difference of many years in prison turned on the value of Allen's cooperation, a consideration which made the jury well aware of the powerful incentive Allen had to shade his testimony in favor of the government. Thus, evidence regarding Allen's involvement with the minors has much less probative value than it would were it the only incentive for Allen to assist the government. Put another way, evidence of Allen's involvement with the minors may be described as needlessly cumulative on the question of Allen's incentive to help the prosecution. All things considered, it is this court's view that the probative value of the evidence was substantially outweighed by the risks just discussed. The evidence would have been excluded under Rule 403.

---

[64]See Fed. R. Evid. 611(a)(3), Advisory Committee Notes (pointing out that the court needs to consider the importance of the testimony, nature of inquiry, and relevance to credibility).

Kott also cites to an FBI 302 dated October 28, 2004, indicating that Allen's lawyer provided "CHILD VICTIM 1" an affidavit containing false statements - indicating that she had not had sex with Allen - and that she had signed the affidavit at Allen's request.[65] This information is also reflected in an APD report dated February 13, 2008, at which time the APD appears to have been actively investigating Allen for sexual abuse of a minor.[66] These materials clearly suggest that Allen's character for truthfulness was doubtful. However, under Rule 608 Kott would have been prohibited from attempting to prove this by extrinsic evidence. He would have been left to inquire about the matter (assuming the court would permit the inquiry–as it would have) in cross-examination of Allen himself. It is known that Allen had previously denied the conduct, so he surely would have repeated the denial. The result is that this line of inquiry would not be of significant assistance to Kott. In the view of this court, the evidence regarding the alleged subornation of perjury is not material in the context of all the evidence, and the failure to disclose it did not prejudice Kott.[67]

## C. Request for Additional Discovery and Evidentiary Hearing

Kott also requested additional discovery and an evidentiary hearing by way of alternative relief. To the extent that the additional discovery or a hearing may have been sought to provide some sort of additional check on the veracity of the current set of prosecutors' adherence to their duty to disclose *Brady* material, the court finds such an undertaking inappropriate and unnecessary. Given the broad scope of material already produced (in some instances going beyond anything *Brady* and its progeny require) and

---

[65]Docket 405-4 at 18 (BRADY 004666).

[66]*Id.* at 17 (BRADY 004665).

[67]The court has reviewed Kott's statement of supplemental authorities filed at docket 428. The court concludes that the first two authorities cited - *United States v. Slough* (— F. Supp. 2d —, No. 08-0360 (D. D.C. Dec. 31, 2009)) and *United States v. Nicholas and Ruehle* (— F. Supp. 2d —, No. 08-139 (C.D. Cal. Dec. 15, 2009)) - are to be distinguished from the present case because Kott has presented no evidence of reliance on a compelled statement from the defendant nor any persuasive evidence of improper influence by government attorneys on the witnesses. The two newly-released Justice Department memoranda also cited at docket 428 appear to mandate obligations with which the government has already complied.

the circumstances which gave rise to the production - including the installation of a new team of prosecutors under instruction from a new Attorney General to see that the government met its discovery obligations - additional discovery is unwarranted and an evidentiary hearing would be inappropriate. To the extent that the alternative was presented to assist the court in establishing what remedy would be appropriate, the hearing is unnecessary, because the court has concluded that Kott is not entitled to a remedy.

**D. Release Pending Appeal**

This case is in a novel posture. Not only were the issues which gave rise to the remand highly unusual, but the government sought Kott's release pending resolution of the issues. Finally, although this court has not found a sufficient basis to order a new trial or dismissal of the indictment, it is certainly possible that the Circuit Court will see the matter differently. Accordingly, because the court does not view Kott as a flight risk or a danger to public safety, and because Kott's anticipated appeal will raise a substantial question of law and would not be intended merely to create delay in the conclusion of the matter, the court will allow Kott to remain on release status pending a decision by the Court of Appeals respecting all of the issues which will soon be before that court when Kott appeals this decision.[68] The conditions of release previously imposed shall remain in effect with no change, pending further order of this court or the Court of Appeals.

## IV. CONCLUSION

For the reasons set forth above, defendant's motion at docket 404 is **DENIED**. This court will not entertain any motion for reconsideration. The Clerk of Court will please immediately forward a copy of this order to the Ninth Circuit Court of Appeals to signify that this court believes it has complied with that court's remand order.

---

[68] 18 U.S.C. § 3143(b)(1).

-19-

Case 3:07-cr-00056-RRB   Document 429   Filed 01/13/10   Page 19 of 20

Pending resolution of this matter by the Court of Appeals, or further order of this court, Kott shall remain on release status subject to the conditions which have previously been established.

DATED at Anchorage, Alaska, this 13th day of January 2010.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE